No. 15-1110

IN THE

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔳𝔢𝔫𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

BEAVEX, INC.,

*Defendant-Appellant, Cross-Appellee*

v.

THOMAS COSTELLO, MEGAN BAASE KEPHART,
OSAMA DAOUD, et al., individually and on behalf
of all others similarly situated

*Plaintiffs-Appellees, Cross-Appellants.*

On Petition for Interlocutory Appeal from an Order of the United
States District Court for the Northern District of Illinois

Case No. 12-cv-7843
The Honorable Judge Virginia M. Kendall

**BRIEF AND REQUIRED SHORT APPENDIX OF
DEFENDANT-APPELLANT**

McGuireWoods LLP

Kevin M. Duddlesten
2000 McKinney Ave., Suite 1400
Dallas, Texas 75201
Telephone: 214.932.6419

Brian E. Spang
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601
Telephone: 312.750.3532

W. Joseph Miguez
816 Congress Ave., Suite 940
Austin, Texas 78701
Telephone: 512.617.4524

*Counsel for Defendant-Appellant, Cross-Appellee*

**DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned attorney certifies that Defendant BeavEx Incorporated is a privately-owned corporation and has no corporate parent. There is no publicly-held company that owns 10% or more of the stock of BeavEx Incorporated.

March 6, 2014

Respectfully submitted,

By: /s/ *Kevin M. Duddlesten*
    Kevin M. Duddlesten
    MCGUIREWOODS LLP
    2000 McKinney Ave., Suite 1400
    Dallas, Texas 75201
    Telephone:214.932.6419
    Facsimile: 214.273.7484

    Counsel of Record for Defendant-Petitioner
    BeavEx Incorporated

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ........................................................................ 1

STATEMENT OF ISSUE PRESENTED FOR REVIEW .......................................... 2

STATEMENT OF THE CASE ............................................................................... 3

I.  Nature of the Case ........................................................................ 3

II.  Relevant Facts .............................................................................. 4

  A.  BeavEx's Independent Contractor-Based Business Model ...................... 4

  B.  Services Offered by BeavEx to its Illinois Clients ................................... 5

  C.  BeavEx's Illinois Workforce .................................................................. 5

  D.  Impact of Possible Switch from an Independent-Contractor-Based
      Courier Model to an Employee-Based Courier Model ............................. 6

III.  Course of Proceedings in the District Court .............................. 8

IV.  Rulings Presented For Review ..................................................... 10

V.  Standard of Review ...................................................................... 11

SUMMARY OF THE ARGUMENT ...................................................................... 12

ARGUMENT ..................................................................................................... 17

I.  The Governing Legal Standard for FAAAA Preemption .................... 17

  A.  Background and Scope of the FAAAA's Preemption Provision ............. 17

  B.  Cases Interpreting the Broad Scope of the FAAAA's Preemption
      Provision ............................................................................................ 18

    1.  United States Supreme Court Precedent ...................................... 18

    2.  Seventh Circuit and Other Circuit Court Precedent ..................... 20

    3.  Preemption of Laws Affecting Independent Contractor
        Relationships ............................................................................... 22

II.  The FAAAA Preempts The IWCPA as to BeavEx ............................. 27

  A.  Enforcing The IWPCA Against BeavEx Would Substantially
      Impact BeavEx's Services and Routes .................................................. 27

  B.  Enforcing the IWPCA Against BeavEx Would Substantially
      Impact BeavEx's Prices ....................................................................... 28

  C.  The District Court Erred In Denying BeavEx's Motion for
      Summary Judgment on FAAAA Preemption ......................................... 29

  D.  Plaintiffs Are Attempting To Substitute A State Policy, Embodied
      In The IWPCA, For Their Contractual Agreements With BeavEx ......... 32

**TABLE OF CONTENTS**
(continued)

**Page**

CONCLUSION .......................................................................................................................... 34

STATEMENT CONCERNING ORAL ARGUMENT ............................................................... 35

CERTIFICATE OF COMPLIANCE ........................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*American Airlines, Inc. v. Wolens*,
   513 U.S. 219 (1995) (ADA) .......................................................................18

*American Trucking Associations, Inc. v. City of Los Angeles*,
   133 S.Ct. 2096 (2013)........................................................................19, 26

*American Trucking Associations, Inc. v. City of Los Angeles*,
   660 F.3d 384 (9th Cir. 2011), *rev'd in part on other grounds*, 133 S.Ct. 2096 (2013)............23

*Dan's City Used Cars, Inc. v. Pelkey*,
   133 S.Ct. 1769 (2013)........................................................................19, 25

*DiFiore v. American Airlines*,
   646 F.3d 81 (1st Cir. 2011) ....................................................................20

*Dilts v. Penske Logistics, LLC*,
   769 F.3d 637 (9th Cir. 2014) ..................................................................22

*Federal Express Corp. v. California Public Utilities Comm'n.*,
   936 F.2d 1075 (9th Cir. 1991) ................................................................23

*Massachusetts Delivery Association v. Coakley*,
   769 F.3d 11 (1st Cir. 2014)...........................................................13, 23, 31

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)........................................................................18, 22

*Northwest, Inc. v. Ginsberg*,
   134 S.Ct. 1422 (2014)................................................................. *passim*

*Patriotic Veterans, Inc. v. State of Indiana*,
   736 F.3d 1041 (7th Cir. 2013) .................................................................11

*Remington v. J.B. Hunt Transport, Inc.*,
   2015 U.S. Dist. LEXIS 13825 (D. Mass., Feb. 5, 2015) ............................25, 26, 29

*Rowe v. N.H. Motor Transp. Ass'n*,
   552 U.S. 364 (2007)..................................................................... *passim*

*S.C. Johnson & Son, Inc. v. Transportation Corp. of America*,
   697 F.3d 544 (7th Cir. 2012) .......................................................... *passim*

*Sanchez v. Lasership, Inc.*,
   937 F.Supp.2d 730 (E.D. Va. 2013) ............................................................................ *passim*

*Schwann v. FedEx Ground Package System, Inc.*,
   2015 U.S. Dist. LEXIS 13826 (D. Mass., Feb. 5, 2015) ............................................25, 26, 29

*Stable Investors Partnership v. Vilsack*,
   775 F.3d 910, --, 2015 U.S. App. LEXIS 151 (7th Cir. Jan. 5, 2015) ....................................11

*Tifft Exelon Corp.*, 366 F.3d 513, 516 (7th Cir. 2004) ..................................................................11

*Travel All Over the World, Inc. v. Saudi Arabia*,
   73 F.3d 1423 (7th Cir. 1996) ....................................................................................20, 22, 29

*Treiber & Staub, Inc. v. UPS*,
   474 F.3d 379 (7th Cir. 2007) ....................................................................................................28

*United Airlines, Inc. v. Mesa Airlines, Inc.*,
   219 F.3d 605 (7th Cir. 2000) ............................................................................................20, 21, 22

## STATUTES

820 ILCS 105 ......................................................................................................................................7

820 ILCS 105/1 *et seq.* .....................................................................................................................8

820 ILCS 105/4(a)(1) .........................................................................................................................7

820 ILCS 105/4a(1) ............................................................................................................................7

820 ILCS 140 ......................................................................................................................................7

820 ILCS 305/1 *et seq.* .....................................................................................................................7

820 ILCS 405/1 *et seq.* .....................................................................................................................7

28 U.S.C. § 1292 ............................................................................................................................1, 35

28 U.S.C. § 1292(b) ......................................................................................................................9, 10

28 U.S.C. § 1331 ................................................................................................................................1

29 U.S.C. § 207 ..................................................................................................................................7

29 U.S.C. § 4980H .............................................................................................................................7

Airline Deregulation Act of 1978, 49 U.S.C. § 41701 *et seq.* .......................................................18

California Public Utilities Code § 4128.5(b) ...................................................................................22

Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501 *et seq.* ..... *passim*

Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA") ................ *passim*

Mass. Gen. Laws ch. 149, § 148B(a)(2) ............................................................... *passim*

**OTHER AUTHORITIES**

29 C.F.R. 785.17 ...............................................................................................7

H.R. Rep. p. 87, 1994 U.S.C.C.A.N at 1759. .......................................................23, 33

## JURISDICTIONAL STATEMENT

Pursuant to its jurisdiction to take an immediate appeal of orders certified for interlocutory appeal by a District Court, this Court granted BeavEx's *Petition for Permission to Review Under 28 U.S.C. § 1292*, which was filed within the ten-day period permitted by 28 U.S.C. § 1292 and was therefore timely.

As to the underlying issue, the question presented to this Court is whether federal law (specifically, the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501 *et seq.*) preempts a law of the State of Illinois. The matter therefore "arises under" the Constitution and laws of the United States, and this Court has jurisdiction under both Article III, Section II of the Constitution and 28 U.S.C. § 1331.

**STATEMENT OF ISSUE PRESENTED FOR REVIEW**

Whether the Federal Aviation Administration Authorization Act of 1994 ("FAAAA")'s preemption provision, 49 U.S.C. § 14501(c)(1), preempts the definition of "employee" as set forth at Section 2 of the Illinois Wage Payment and Collection Act, 820 ILCS 115/2 ("IWPCA"), to the extent that definition imposes limitations upon the use of independent contractors by Illinois employers.

## STATEMENT OF THE CASE

### I.     Nature of the Case

This case concerns the definition of the term "employee" under the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA"), and whether that provision of the IWPCA is preempted by the FAAAA's preemption provision.  Defendant BeavEx contends that it is preempted, since that provision of the IWPCA prevents Illinois motor carriers like BeavEx from using independent contractors except where, among other things, the contract "performs work which is either outside the usual course of business or is performed outside all the places of business of the employer."  BeavEx is a leading provider of time-critical, same-day transportation and logistics services to business customers across the United States, including customers in Illinois, and the Plaintiffs in this case are independent contractor couriers who formerly contracted to perform services for BeavEx, and have now sued BeavEx under the IWPCA.  As it relates to this appeal, Plaintiffs allege that they are entitled to reimbursement for certain compensation and expenses the IWPCA and other laws mandate for employees.

In the District Court, BeavEx moved for summary judgment on the grounds that the IWPCA's purported classification of BeavEx's independent contractor couriers (i.e., independent contractors who perform work that is not outside the usual course of BeavEx's business) as "employees" is preempted by the FAAAA, which expressly preempts any state law "related to a price, route, or service of any motor carrier." But the District Court denied BeavEx's motion, holding that the IWPCA is a general "background law" that falls outside the scope of FAAAA preemption, and that BeavEx was required to present detailed empirical evidence of the effect of the challenged IWPCA provision on its business in order to obtain summary judgment.  The District Court has now certified this case for interlocutory appeal, and this Court granted BeavEx's petition for interlocutory review.

## II.     Relevant Facts

### A.     BeavEx's Independent Contractor-Based Business Model.

BeavEx is a leading provider of time-critical, same-day transportation and logistics services to business customers across the United States, including customers in Illinois. *See* Defendant's Local Rule 56.1(a)(3) Statement of Material Facts as to Which There is No Genuine Dispute, Docket Entry ("DE") 63, Ex. A (hereinafter, "63-1"), ¶ 3. BeavEx provides its customers with motor vehicle transportation of property for compensation, 63-1, ¶ 4. To do so, BeavEx coordinates and provides delivery services to its customers using independent contractor courier drivers, who drive their own cars or trucks. *Id.*.  Some of BeavEx's Illinois couriers are incorporated businesses, while others are not.  63-1, ¶ 10.  Many of BeavEx's couriers hire employees or utilize subcontractors to complete the routes upon which they have bid.  *Id.* BeavEx does not prohibit or discourage this sort of subcontracting of the delivery routes, as it regards its independent contractor-couriers as distinct and autonomous businesses, whether sole proprietors, corporations or otherwise.  *Id.*

During the time period relevant to this appeal, BeavEx contracted with 104 couriers in Illinois.  63-1, ¶ 9.  BeavEx pays its couriers by route for each delivery they complete, not by hours or weeks worked.  *Id.*  BeavEx does not provide its couriers with benefits such as health insurance or workers' compensation, and does not pay payroll taxes or unemployment contributions for them.  *Id.*  Each courier enters into a written Contract Management Services Agreement with BeavEx, which govern the couriers' compensation. *See* Plaintiff's Local Rule 56.1(a)(3) Statement of Material Facts as to Which There is No Genuine Dispute, DE 77, p. 8, ¶ 46. That Agreement governs not only the couriers' method of payment, but also authorizes various deductions from the couriers' pay for, among other items, occupational accident

insurance, cargo insurance, uniforms, scanners, and chargebacks, none of which are paid for by BeavEx. DE 77, p.8, ¶¶ 45-53.

### B.    Services Offered by BeavEx to its Illinois Clients

BeavEx offers its clients both "scheduled-route" and "on-demand" delivery services. 63-1, ¶ 5.  Scheduled-route services are those where BeavEx's clients dictate in advance regular times and locations at which pick-ups and/or drop-offs must be made. 63-1, ¶ 6. To fulfill these services, BeavEx contracts with couriers who can accommodate a client's pick-up/drop-off schedule. *Id.* BeavEx currently has approximately 280 scheduled routes in Illinois that it coordinates on a regular basis.  *Id.*

For its on-demand delivery services, BeavEx regularly receives calls from clients, with little or no advance notice, for rush deliveries (for example, when one of BeavEx's pharmacy clients needs medication delivered in an acute care situation). 63-1, ¶ 7.  By their nature, on-demand jobs are variable and unpredictable: some days may have dozens of on-demand rush jobs, while others may have no such deliveries. *Id.* BeavEx is able to offer this service to its clients by engaging various couriers on an exigent basis. 63-1, ¶¶ 7-8.  Specifically, each day couriers will contact BeavEx and state if they are available to provide deliveries that day. 63-1, ¶ 8. If BeavEx's clients' needs that day coincide with the couriers' availability, BeavEx will offer the deliveries to the couriers who have identified themselves as available. *Id.* These couriers can (and do) reject such offers from BeavEx and refuse to take such deliveries. *Id.* While numbers fluctuate, BeavEx receives approximately 40 orders for on-demand delivery services per week.  63-1, ¶ 7.

### C.    BeavEx's Illinois Workforce

To handle administrative and warehouse duties for the above-described Illinois operations, BeavEx currently employs nine full-time employees and one part-time employee in

Illinois. 63-1, ¶ 11. These ten employees are BeavEx's only employees in Illinois. *Id.* BeavEx pays these Illinois employees on an hourly or salary basis, and provides them with all benefits required by law, which include a minimum salary or wage, overtime where applicable, health insurance and workers' compensation insurance, as well as paying payroll taxes and making unemployment insurance contributions for them. *Id.* Because it has so few Illinois employees, and thus relatively few employment-related issues, BeavEx does not employ a dedicated human resources professional in Illinois, but instead handles those functions for its Illinois employees through the company's central human resources function at its corporate headquarters in Atlanta, Georgia, where a small team of human resources professionals handles human resources functions for the entire company nationwide. DE 63-1, ¶ 12.

### D.     Impact of Possible Switch from an Independent-Contractor-Based Courier Model to an Employee-Based Courier Model

If the IWPCA were enforced as to BeavEx (that is, if Plaintiffs' lawsuit were to succeed), its effect would be to reclassify all of BeavEx's independent contractor couriers as employees, and to prohibit BeavEx from using independent contractors as couriers going forward. If BeavEx were required to cease using independent contracts as couriers, and instead hire employees to fill those roles, the company would incur numerous and significant additional expenses. For example, BeavEx's couriers are paid by the route. 63-1, ¶ 9. If BeavEx were required to hire them as employees, they would instead be entitled to payment by the hour, plus overtime (as applicable based on hours worked), benefits, and mileage, and they would be required to start their day at BeavEx's worksite, and be entitled to payment for those additional "stem miles" to and from the BeavEx facility. DE 63-1, ¶¶ 14-16. Additionally, BeavEx's couriers own and maintain their own vehicles. 63-1, ¶ 4. Same-day couriers like BeavEx that use employees as couriers typically own, store, and maintain the vehicles used by their couriers,

63-1, ¶ 15, and Plaintiffs in this case have specifically requested that BeavEx be required to bear all those automotive expenses, as well as other expenses related to uniforms, cell phones, and other related items and equipment that BeavEx does not currently pay.  DE 34 at ¶¶ 28-29.

From a human resources perspective, the hiring of over a hundred new employees would constitute a tenfold increase in the size of BeavEx's Illinois employee headcount, and would require BeavEx to employ a dedicated human resource professional in Illinois to assist it in managing a legally compliant workforce.  63-1, ¶ 13.  Additionally, BeavEx's relationship with its couriers would be subject to numerous additional state and federal laws and regulations with regard to its couriers that do not currently impact that part of its business, including family and medical leave laws, state and federal wage and hour laws, laws requiring workers' compensation insurance and the withholding of payroll taxes, and, going forward, laws requiring employers to provide medical insurance. DE 63-1, ¶¶ 9, 11; *see* 820 ILCS 105/4(a)(1); 820 ILCS 105/4a(1); 820 ILCS 305/1 *et seq*.; 820 ILCS 405/1 *et seq*.; 29 U.S.C. § 4980H.

If BeavEx's couriers were converted from independent contractors to employees, then federal and Illinois wage and hour laws would impose restrictions on their pay and working hours that do not apply to them as independent contractors. Employees are entitled to pay at one-and-a-half times their hourly rates for any hours worked over forty in a week. 29 U.S.C. § 207; 820 ILCS 105. Additionally, time that an employee spends in on-call status must be paid at the employee's hourly rate if, during that time, the employee is not "effectively free to use his or her time for his or her own purposes." 29 C.F.R. 785.17. And under Illinois law, an employee cannot work more than seven and a half continuous hours without taking a twenty minute, uninterrupted meal break, which must be provided within five hours of the start of the work. 820 ILCS 140. These rules do not apply to independent contractors.

Each of the above-listed legal and functional requirements would impose upon BeavEx a cost or expense that does not exist under BeavEx's independent-contractor-based courier model. For example, the pure cost of labor for BeavEx to employ and maintain a regional or district human resource professional and administrative support for the human resource function in Illinois, an expense that would be required by the tenfold growth of BeavEx's Illinois employee headcount, would be approximately $185,000 per year, exclusive of facilities, equipment, recruiting, and training costs. DE 63-1, ¶ 13. Additional costs would logically and necessarily arise if BeavEx were required to purchase, maintain, and store couriers' vehicles, provide workers' compensation and medical insurance, withhold payroll taxes, and contribute to unemployment insurance for such new, additional employees. *See* state and federal statutes cited above.

## III.    Course of Proceedings in the District Court.

Plaintiffs filed their lawsuit against BeavEx on October 1, 2012 in the United States District Court for the Northern District of Illinois (and filed their Amended Complaint on January 11, 2013), alleging causes of action for violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* (IWPCA), as well as for violation of the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* and for the Illinois common-law tort of unjust enrichment. *See generally* Amended Complaint, DE 34. Plaintiffs' claims are premised entirely on their allegations that they should have been treated by BeavEx as employees under Illinois law, and specifically the IWPCA's definition of "employee," but were instead misclassified as independent contractors. *Id.* at ¶ 1. Plaintiffs allege that BeavEx violated the IWPCA by "failing to compensate [them] for all hours worked" and by "making unlawful deductions from [their] pay." *Id. at* ¶¶ 43-44. Plaintiffs' IWPCA claim seeks recovery of all alleged "unpaid wages as well as reimbursement for all unlawful deductions taken by [BeavEx] from their pay,"

*Id. at* ¶ 45, in addition to all costs related to their purchase or lease, maintenance, insurance, and operation of their vehicles. *Id. at* ¶¶ 28, 47.

On August 13, 2012, BeavEx moved for summary judgment, asking the District Court to rule as a matter of law that the FAAAA preempts the IWPCA's broad definition of "employee" and prohibition of the use of independent contractors to perform services not "outside [BeavEx's] usual course of business." *Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment.* DE 62, p. 6.[1]  On September 23, 2013, Plaintiffs moved for partial summary judgment on their IWPCA claim.  DE 75.  The District Court denied BeavEx's motion for summary judgment and granted Plaintiffs' motion for summary judgment on March 31, 2014. *Memorandum Opinion and Order* (DE 95; RSA.001-029).

On April 28, 2014, BeavEx moved for reconsideration of the Court's denial of its summary judgment motion. *Defendant BeavEx Inc.'s Memorandum of Law in Support of Its Motion for Reconsideration.* DE 105.  On October 29, 2014, the District Court denied BeavEx's Motion for Reconsideration. *Order.* (DE 139; RSA.030-035).

On November 11, 2014, BeavEx and the plaintiffs jointly moved the District Court to certify for interlocutory appeal the question of whether the FAAAA's preemption provision preempts the definition of "employee" as set forth at Section 2 of the IWPCA, to the extent that definition imposes limitations upon the use of independent contractors by Illinois employers. *Joint Motion for Certification of Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b), for Recommendation of Interlocutory Appeal Pursuant to FED. R. CIV. P. 23(f), and for a Stay During the Pendency of the Interlocutory Appeals.* DE 141.  On December 1, 2014, the District Court granted BeavEx's motion and certified that question for interlocutory appeal. *Order.* DE

---

[1]     This brief cites to the record by referring to the docket entries in the District Court – "DE" – and to the docket entries in this Court – "7th Cir. DE".

143. On December 11, 2014, BeavEx timely filed its Petition for Permission to Appeal Under 28 U.S.C. § 1292(b). 7th Cir. DE 1.  On January 15, 2015, this Court granted BeavEx's petition to file an interlocutory appeal. 7th Cir. DE 4.

## IV.    Rulings Presented For Review.

The District Court denied BeavEx's summary judgment motion and concluded that the FAAAA did not preempt the IWPCA for two main reasons.  Primarily, the District Court concluded that the IWPCA "fits the mold of a 'background law' [that] applies to all employers and employees in Illinois," and "[c]onsidering its purpose and procedures, the IWPCA affects BeavEx only as a member of the public."  RSA.012.  Additionally, the District Court concluded that BeavEx had "offered no numerical calculations of the effect enforcement of the IWPCA would have on its business," and "appears to attempt to meet its challenge of demonstrating a significant impact by relying on logic alone."  RSA.014.

The District Court adhered to these two reasons in its order denying BeavEx's motion for reconsideration.  RSA.034. ("Any impact on BeavEx's rates, routes or services is ... peripheral to the actual focus of the law:  to regulate the employer-employee relationship in Illinois generally. The IWPCA is therefore a broad law with no forbidden connection with prices, routes and services") (citations and internal marks omitted); RSA.035 ("BeavEx's lack of evidence demonstrating a significant impact of the IWPCA was merely additional support for the Court's ultimate conclusion that the IWPCA is not preempted by the FAAAA.  The crux of the Court's Opinion was that because the IWPCA simply standardizes the employment arena within Illinois and operates at least a step away from the point where BeavEx offers services to its customers, it does not meet the related to' test necessary for FAAAA preemption").

BeavEx seeks review of these rulings.  Specifically, BeavEx seeks review of the District Court's ultimate ruling that the IWPCA's definition of "employee" is not preempted by the

FAAAA.  BeavEx also seeks review of the District Court's "additional support" for its ultimate ruling – *i.e.*, the District Court's ruling that BeavEx did not present evidence of the significant economic impact of the IWPCA on its prices, routes and services.  BeavEx therefore seeks review of the District Court's denial of its motion for summary judgment and, concomitantly, the District Court's granting of Plaintiffs' motion for partial summary judgment based upon the IWPCA's definition of "employee."  RSA.024-029.

## V.    Standard of Review.

The standard of review for summary judgment rulings and rulings on federal preemption of state law is de novo.  *Stable Investors Partnership v. Vilsack*, 775 F.3d 910, --, 2015 U.S. App. LEXIS 151, *12 (7th Cir. Jan. 5, 2015) ("We review the district court's summary judgment decision de novo");  *Patriotic Veterans, Inc. v. State of Indiana*, 736 F.3d 1041, 1045-46 (7th Cir. 2013) ("We review the district court's summary judgment decision pertaining to preemption de novo"); *Tifft Exelon Corp.*, 366 F.3d 513, 516 (7th Cir. 2004) ("we [] review a district court's preemption ruling de novo").

## SUMMARY OF THE ARGUMENT

Over the past two decades, the United States Supreme Court has, on a number of occasions, been asked to rule on the scope and force of the FAAAA's and ADA's preemption provisions. In their rulings, the Court has taken great pains to repeatedly stress the broad preemptive reach of those provisions as they pertain to state and local laws, regulations, and ordinances that relate to the prices, routes, or services of motor carriers and air carriers respectively. As a result, the Court has deemed a wide and diverse selection of state laws (both common and statutory) preempted, including state deceptive trade practices acts, consumer fraud protection laws, laws designed to limit minors' access to tobacco, and a parts of a city's clean air action plan applicable to motor carriers at its ports. Most recently, in *Northwest, Inc. v. Ginsberg*[2]—the Court's third ruling on FAAAA or ADA preemption issues in an eleven-month span—the Court held that a Minnesota state common-law tort for breach of the duty of good faith and fair dealing was preempted by the ADA when raised in the context of a disgruntled consumer suing to be reinstated to an airline's frequently flyer miles program. In each of these cases, the Court found the various state laws to have a substantial impact on either the prices charged, routes driven or flown, or services offered by the defendant motor or air carriers at issue.

Meanwhile, circuit courts—including the Seventh Circuit—have generally taken a similarly broad approach to the question of FAAAA/ADA preemption, finding that those laws preempt a similarly wide array of state laws, including claims for violation of a state's consumer protection and antitrust laws, and claims for breach of fiduciary duty, various theories of fraud, and intentional infliction of emotional distress, among others. In fact, the preemptive scope of

---

[2] 134 S.Ct. 1422 (2014). See discussion below at Argument Section I.B.1.

12

the FAAAA and ADA has generally been found to be so broad that only two primary types of state laws escape its force: first, those (such as breach of contract claims) that primarily relate not to violation or enforcement of any policy of the state, but rather to violation or enforcement of the parties' privately-agreed-to rights and responsibilities, and second, those whose connection to a motor or air carrier's prices, routes, or services is too tenuous, typically because the law applies to events transpiring far outside the course of motor or air transportation, or the setting of prices to be charged, routes to be driven or flown, and services to be offered therein.

The type of state law at issue in this case—namely, one that prohibits a motor carrier's use of independent contractor drivers (sometimes referred to as owner-operators) in a broad range of situations—has been the subject of repeated review and analysis by federal courts. These laws were the very sort Congress cited in passing the FAAAA, recognizing that a "patchwork" of state laws and local ordinances banning, limiting, or disincentivizing the use of independent contractor drivers was preventing businesses from implementing the desires uniform nationwide business practices. In recent years, a number of federal courts, including both the Ninth and First Circuits, have held that such state-level regulation of the relationship between motor carriers and the drivers they engage are preempted by the FAAAA.

The most impactful recent decision on that front was issued by the First Circuit in *Massachusetts Delivery Association v. Coakley*.[3] There, the Court held that a Massachusetts law whose relevant language and prohibitions are substantially identical to those at issue in the present case was preempted by the FAAAA. In *Mass. Delivery Ass'n.*, as in the present case, the motor carrier in question engaged its courier drivers not as employees, but as independent contractor. In doing so, it violated the Massachusetts Independent Contractor Statute, which—

---

[3] 769 F.3d 11.  See discussion below at Argument Section I.B.3.

just like the Illinois statute before this Court—prohibits the state's employers from engaging contractors instead of employees to perform work within the employer's usual course of business.  In *Mass. Delivery Ass'n.*, just as in the present case, the District Court denied the motor carrier's motion for summary as to FAAAA preemption and, in doing so, made essentially the same two errors the District Court made in this case.  Namely, the District Court ruled that laws prohibiting the use of independent contractors do not relate to a motor carrier's prices, routes, or services, but instead fall into the realm of so-called "background laws" that are too tenuously related to those matters to be preempted.  The District Court also rejected the motor carrier's argument that a logical assessment of the law's potential impact on the industry as a whole, and its business as a part of that industry, was sufficient evidence to show the law's relation to the carrier's prices, routes, or services, and thus for the court to rule in the carrier's favor.  In reversing the District Court, the First Circuit rejected the idea of a state's independent contractor laws being summarily classified as "background laws," and rejected the District Court's analysis of the law's impact on prices, routes, and services, holding that the logical impact of such a law on a motor carrier's prices, routes, or services can be sufficient to support preemption, regardless whether that impact is direct or indirect.

Against this backdrop, it is evident that the District Court in this case erred when it denied BeavEx's motion for summary judgment as to FAAAA preemption.  The Illinois statute under which Plaintiffs have sued BeavEx is substantially identical to the Massachusetts law the Court addressed in *Mass. Delivery Ass'n.*, and the District Court's analysis in this case contained the same two fatal flaws as that of the District Court in *Mass. Delivery Ass'n.*  The facts and record before this Court show that the Illinois law strongly and closely relates to the very business model under which BeavEx provides services to its customers, including the routes it is

able to profitably offer those customers, and the prices it must charge them to remain profitable. If it were not able to utilize independent contractor couriers to provide delivery services, BeavEx would be compelled to either discontinue or reprice its essential services in order to remain profitable, including the likely elimination of its on-demand delivery service. BeavEx's use of an independent contractor model is a direct response to the market for what its clients want, and the IWPCA's prohibitive limits on the use of independent contractors amounts to an attempt to substitute Illinois's own governmental policies for the competitive forces within the motor transportation industry.

In that regard, the IWPCA is hardly a "background law" that only applies to BeavEx as a member of the general public, and the District Court erred in concluding that it was. The IWPCA's independent contractor provision does not simply regulate employment relationships; it <u>mandates</u> them. Rather than a simple rule of workplace conduct, the IWPCA's independent contractor provision specifically directs businesses to create a certain specific business structure and services-delivery model. In doing so, the IWPCA requires Illinois businesses to offer services of a type and in a manner dictated not by the market, but by state policy. And in doing so, the IWPCA does not as a generally-applicable rule for a civil society; such can hardly be true, since Illinois and Massachusetts are the only two states to have and enforce this specific sort of prohibition on independent contractor relationships. Rather than a generally-applicable background law, the IWPCA is exactly the sort of state law Congress targeted when passing the FAAAA: namely, an outlier that, if enforced, would require motor carriers to change their business practices from state to state to comply with a patchwork of random state-level requirements.

The District Court also erred in ruling that BeavEx was required to present empirical evidence of the impact compliance with the IWPCA would have on its Illinois business model. As the Supreme Court held nearly a decade ago in *Rowe v. New Hampshire Motor Transport Association*, and the First Circuit reiterated just a few months ago in *Mass. Delivery Ass'n.*, empirical evidence of a state law's relation to and potential impact on a motor carrier's price, routes, or services is <u>not</u> necessary to show preemption. Instead, the <u>logical</u> effect of such a law on the carrier's prices, routes, or services can by itself be sufficient proof, even if that effect is only indirect. In the present case, BeavEx not only offered direct evidence of the IWPCA's potential impact upon its business (namely, enforcement of the IWPCA would result in BeavEx's Illinois employee population increasing tenfold, and would thus require the company to recruit, train, and maintain an on-site human resources specialist for that population, at a cost of nearly two hundred thousand dollars), but also cited the logical effect and financial impact of converting its couriers from independent contractors to employees. Namely, if BeavEx were required to take that step, it would be subject to numerous legal obligations toward those couriers that do not currently apply, including minimum wage, maximum hour, and overtime requirements, mandated payroll tax payments and withholding requirements, mandated workers' compensation and medical insurance, and mandated contributions to state unemployment insurance, in addition to other remedies specifically requested in Plaintiffs' complaint, which include requirement BeavEx to purchase or lease, store, and maintain automobiles for its couriers. Logic dictates that the cost to BeavEx of compliance with these new mandates could run well into the hundreds of thousands, if not millions of dollars.

For these reasons, the District Court erred in denying BeavEx's motion for summary judgment on the issue of whether the FAAAA preempted the independent contractor provisions

of the IWPCA, and this Court should reverse that denial, and rule that the FAAAA preemption applies here.

## ARGUMENT

As explained above, BeavEx, a delivery service courier company, contends that Plaintiffs' claims under the IWPCA are preempted by the FAAAA. And as shown herein, BeavEx is supported in that contention by both the history and text of the FAAAA, and the overwhelming weight of relevant Supreme Court and Circuit case law.

## I.      The Governing Legal Standard for FAAAA Preemption.

### A.      Background and Scope of the FAAAA's Preemption Provision.

The FAAAA is a key component of Congress' deregulation of both the aviation and motor transportation industries. *See generally S.C. Johnson & Son, Inc. v. Transportation Corp. of America*, 697 F.3d 544, 548-49 (7th Cir. 2012) (reviewing the United States' "great experiment in the regulation of the transportation industry" starting in 1887, and deregulation efforts from the 1970s through the FAAAA in 1994). Among Congress's primary objectives in passing the FAAAA was to ensure that arbitrary restrictions on entry into the trucking profession, on the routes carriers could drive, and on the goods carriers could transport were lifted, and that with a few exceptions not relevant to this litigation, state laws and regulations which imposed an "unreasonable burden" on the "intrastate transportation of property" would be prohibited. *Id.* at 549. To ensure that the motor transportation industry would thus be ruled primarily by market forces, and not by government regulation, Congress "decided to address these concerns through the device of preemption[.]" *S.C. Johnson*, 697 F.3d at 549 (quoting FAAAA § 601(a)). As the Supreme Court has described it, the FAAAA's preemption provision was intended to prevent a "patchwork of state service-determining laws, rules, and regulations," because such a patchwork would be "inconsistent with Congress' major legislative effort to leave

such decisions, where federally unregulated, to the competitive marketplace." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2007) (citing H.R. Conf. Rep. 103-677, p. 87 (1994) ("H.R. Rep."), reprinted in 1994 U.S.C.C.A.N.1715, 1759).

The FAAAA's preemption provision states in relevant part that

"a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier … or any motor private carrier with respect to the transportation of property."

49 U.S.C. § 14501(c)(1). This provision was modeled after the preemption provision in the Airline Deregulation Act of 1978, 49 U.S.C. § 41701 *et seq.* Courts, including the United States Supreme Court, have therefore looked to cases decided under the ADA for guidance when interpreting the FAAAA's preemption language. *See e.g. S.C. Johnson*, 697 F.3d at 551 ("Throughout the *Rowe* opinion the Court drew liberally from *Morales* [*v. Trans World Airlines, Inc.*, an ADA case], and so we are confident that we too should rely as need be on the ADA decisions.").

The present case turns primarily on whether the IWPCA's prohibitions on the use of independent contractors by Illinois employers is "related to a price, route, or service" of BeavEx.

### B.    Cases Interpreting the Broad Scope of the FAAAA's Preemption Provision

#### 1.    United States Supreme Court Precedent

Over the past two-plus decades, the Supreme Court has issued a number of rulings broadly defining the preemptive scope of the FAAAA and the ADA. In doing so, it has held a diverse body of state-level laws, regulations, and ordinances to be preempted, including several states' deceptive trade practices statutes and related enforcement guidelines, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) (ADA case); the Illinois Consumer Fraud and Deceptive Business Practices Act, *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995)

(ADA); certain provisions of the Maine Tobacco Delivery Law, *Rowe*, 552 U.S. 364 (2008) (FAAAA); provisions of the City of Los Angeles, California's clean air action plan applicable to motor carriers, *American Trucking Associations, Inc. v. City of Los Angeles*, 133 S.Ct. 2096 (2013) (FAAAA). Only once since the FAAAA's passage has the Supreme Court held a state law to not be preempted by the FAAAA or ADA; that case, *Dan's City Used Cars, Inc. v. Pelkey*, 133 S.Ct. 1769 (2013), is quite distinguishable from the others listed above, because it involved a state law related not to the air or motor carriage of goods, but rather to the sale of impounded goods long after their transit via motor carrier had ended.

The Supreme Court's most recent ruling on this issue, and its third in a span of eleven months, *Northwest, Inc. v. Ginsberg*, 134 S.Ct. 1422 (2014), was decided on April 2, 2014—just two days after the District Court denied BeavEx's motion for summary judgment.  In *Ginsberg*, the Court once again stressed the "broad pre-emptive purpose" of the federal deregulation statutes (in that case, the ADA), and held that a Minnesota state common-law tort claim for breach of the duty of good faith and fair dealing, as applied to the plaintiff's attempt to be reinstated to the defendant airline's frequent flyer benefits program, "related to" the airline's prices and services, and was therefore preempted.  134 S.Ct. at 1430-31.

Taken together, these Supreme Court cases make clear that the FAAAA's preemptive scope is extremely broad.  The Court has repeatedly explained that the "ordinary meaning" of the phrase "related to" in the ADA and FAAAA "is a broad one" and, thus, the "use of those words 'expresses a broad pre-emptive purpose.'" *Dan's City Used Cars, Inc. v. Pelkey*, 133 S.Ct. 1769, 1778 (2013) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). Under the Court's reasoning, "related to" means "having a connection with or reference to" motor carrier "rates, routes and services, whether directly or indirectly."  *Dan's City*, 133 S.Ct. at 1778

(quoting *Morales*, 504 U.S. at 384); *see also Rowe*, 552 U.S. at 370 (FAAAA "preemption may occur even if a state law's effect on rates, routes or services 'is only indirect'") (quoting *Morales*, 504 U.S. at 386). This focus on state laws that only "indirectly" affect prices, routes and services is important. State laws and regulations that do not specifically target the motor carrier industry may nevertheless be preempted, if their effect on motor carriers interferes with Congress's deregulation goals. "What is important," the Supreme Court recently emphasized, "is the effect of a state law, regulation, or provision, not its form[.]" *Ginsberg*, 134 S.Ct. at 1430. To that end, FAAAA "pre-emption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives." *Rowe*, 552 U.S. at 371 (quoting *Morales*, 504 U.S. at 390).

## 2.    Seventh Circuit and Other Circuit Court Precedent

Following the Supreme Court's lead, this and other Circuits have broadly interpreted the FAAAA and ADA preemption language to apply to a similarly wide range of state laws. *See e.g. DiFiore v. American Airlines*, 646 F.3d 81, 88-90 (1st Cir. 2011) (Massachusetts statute governing employee tips and service charges preempted by ADA); *see also S.C. Johnson & Son*, 697 F.3d at 553-55 (collecting Fifth, Eighth, and Ninth Circuit cases finding preemption of various state law claims under FAAAA or ADA). This Circuit alone has previously held that the ADA preempted Illinois state law claims for tortious interference with a contract, breach of fiduciary duty, and fraudulent inducement, *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605 (7th Cir. 2000), as well as claims for intentional infliction of emotional distress and fraud, *Travel All Over the World, Inc. v. Saudi Arabia*, 73 F.3d 1423 (7th Cir. 1996), and that the FAAAA preempts state law claims for fraudulent misrepresentation and conspiracy to commit fraud. *S.C. Johnson & Son*, 697 F.3d at 557.

The *S.C. Johnson & Son* opinion provides a helpful framework for deciding what is ultimately the dispositive question regarding preemption: namely, at what point does application of a state law "have a 'significant impact' related to Congress' deregulatory and preemption-related objectives"? *Rowe*, 552 U.S. at 371 (quoting *Morales*, 504 U.S. at 390). In *S.C. Johnson & Son*, the plaintiff corporation brought a number of state law claims, including the aforementioned claims of fraudulent misrepresentation and conspiracy to commit fraud, plus claims for violation of a Wisconsin state law prohibiting bribery, and violation of Wisconsin's counterpart to the federal Racketeer Influenced and Corrupt Organizations Act, against a number of transportation companies. 697 F.3d at 545. In determining whether preemption applied under the FAAAA, the Court applied Supreme Court precedent and focused on whether the claims at issue sought "to substitute a state policy (embodied in the law) for the agreements that the parties had reached" concerning their business relationship. *Id.* at 558.

Applying this analysis, the Court concluded that the plaintiff's fraudulent misrepresentation and conspiracy to commit fraud claims were in fact preempted by the FAAAA. In so holding, the Court noted that "[s]tate consumer protection laws often contain well-meaning but widely varying paternalistic provisions designed to protect consumers from the rigors of the market. Congress decided, however, in both the ADA and the FAAAA that it did not want (nor did it want the states) to displace the market in this way." *S.C. Johnson & Son*, 697 F.3d at 557. At the same time, the Court found that the claims for violation of the anti-bribery and anti-corruption laws were not preempted, because they were "state laws of general application that provide the backdrop for private ordering" of business generally. *Id.*; *accord United Airlines*, 219 F.3d at 609-10 (distinguishing between claims seeking "to enforce the parties' bargain," which would not be preempted, with "a plea to the court to replace those

bargains with something else."). The Seventh Circuit's rulings in *S.C. Johnson & Son* and *United Airlines* regarding state laws that are <u>not</u> preempted by the FAAAA or ADA are consistent with the guidance provided by other circuits. *See S.C. Johnson & Son*, 697 F.3d at 555-56 (collecting Fifth and Seventh Circuit cases finding no preemption). Generally, courts have found state laws to not be preempted where those laws focus merely on enforcing the parties' contractual agreements, rather than replacing or altering them with a state-ordered obligation (*see e.g.*, *Travel All Over the World*, 73 F.3d at 1432 ("[T]he plaintiffs here are not alleging a violation of state-imposed obligations, but rather are contending that the airline breached a self-imposed undertaking. The terms and conditions in the contract between Travel All and Saudia are "privately ordered obligations" and therefore "do not amount to a State's enactment or enforcement of any law," citing *Wolens*, 115 S.Ct. at 825)), or where those laws truly do not relate to the rates, routes, or services of a motor carrier, but are instead the sort of rules that cover basic conduct in society generally. *See Morales*, 504 U.S. at 390 (ADA does not operate to preempt state laws prohibiting gambling and prostitution); *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, (9th Cir. 2014) (law requiring meal and rest breaks for all California employees "d[id] not directly or indirectly mandate, prohibit, or otherwise regulate certain prices, routes, or services" and therefor was not preempted by FAAAA).

### 3.    Preemption of Laws Affecting Independent Contractor Relationships

One area of particular interest to both Congress and the courts in this context has been state-level laws and regulations that prohibit, limit, or disincentivize motor carriers' use of independent contractors, as opposed to employees, to carry goods in transit—that is, the exact sort of law at issue in the present case. Courts have regularly found these laws to be preempted. In fact, Congress's deliberation over the FAAAA included a reference to just this sort of law, the former California Public Utilities Code § 4128.5(b), which denied exemption from certain state

regulations to motor carriers "using a large proportion of owner-operators [as drivers] instead of company employees." *See* H.R. Rep. p. 87, 1994 U.S.C.C.A.N. at 1759.[4] That California statute was cited as one example of the type of state "regulatory schemes [causing] a huge problem for national and regional carriers attempting to conduct a standard way of doing business." *Id.* And in fact, in a later Ninth Circuit case, the Court ruled that the FAAAA preempted a similar provision in a "concession agreement," required by the Port of Los Angeles to be signed by all vehicle operators on port property, that obligated motor carriers to transition from independent-contractor-based workforces to 100% employee-based workforces over a five year period. *American Trucking Associations, Inc. v. City of Los Angeles*, 660 F.3d 384 (9th Cir. 2011), *rev'd in part on other grounds*, 133 S.Ct. 2096 (2013).

A number of courts have addressed a very similar Massachusetts law containing a prohibition on employers' use of independent contractors that is substantially identical to the one found in the IWPCA.[5] That law, the Massachusetts Independent Contractor Statute, Mass. Gen. Laws ch. 149, § 148B(a)(2) (hereinafter, "Section 148B"), prohibits employers' use of independent contractors except in situations where those workers perform a service that is "outside the usual course of business of the employer"—a prohibition that is nearly identical to the IWPCA provision at issue before this Court.

Most notably, while BeavEx's motion for reconsideration was pending before the District Court, the First Circuit in *Massachusetts Delivery Association v. Coakley*, 769 F.3d 11 (1st Cir. 2014), held that Section 148B was preempted by the FAAAA. In doing so, the Court reversed

---

[4] That law had been passed by the California Legislature in an effort to address the Ninth Circuit's decision in a previous ADA case, *Federal Express Corp. v. California Public Utilities Comm'n.*, 936 F.2d 1075 (9th Cir. 1991).

[5] In fact, Plaintiffs' counsel in this case has repeatedly described the Massachusetts law as "nearly identical" to the IWPCA's independent contractor provisions. *See* instances cited at DE 134, p. 1, fn. 2.

the District Court's denial of the plaintiff trucking association's motion for summary judgment on the FAAAA preemption issue.[6]

Like present case, the *Mass. Delivery Ass'n.* case dealt with a same-day delivery courier service that used independent contractors as courier drivers—a violation of Section 148B's prohibition of the use of independent contractors to perform any service not "outside the usual course of business of the employer." In holding Section 148B to be preempted, the Court in *Mass. Delivery Ass'n.* analyzed the "Broad Standard" of preemption under the FAAAA, *id.* at 17, and concluded that the statute "potentially impacts the services the delivery company provides, the prices charged for the delivery of property, and the routes taken during this delivery," and therefore is "related to" the company's prices, routes, and services. *Id.* at 25.

The Court in *Mass. Delivery Ass'n.* also made two specific rulings that pertain directly to the two key errors that led the District Court in this case to deny BeavEx's motion for summary judgment. First, the First Circuit rejected the argument, raised by the Massachusetts Attorney General, that Section 148B falls into the category of "background laws" that are "generally applicable and not directed to a particular area of federal authority," including "general State employment statutes," and that such "background laws [are] per se 'tenuous' and 'remote,'" so as to escape FAAAA preemption. *Id.* at 18. The First Circuit rejected this argument, stating that "[s]ome courts have indeed used the language of 'background' laws as a shorthand for laws that are found to be too tenuous, remote, or peripheral to carriers' prices, routes, or services to satisfy the 'related to' test," but that "we have never used that language and do not find such language particularly helpful." *Id.* at 19. In rejecting a general classification of state employment-related

---

[6] Not coincidentally, prior to the First Circuit's decision in *Mass. Delivery Ass'n.*, Plaintiff's counsel in the present case had cited to the District Court's ruling in its briefing, arguing that "the [district] court's decision in Mass. Delivery Assn. overwhelmingly supports a finding that the IWPCA is not preempted by the FAAAA." As the saying goes, live by the sword, die by the sword. *See* citation at DE 88, p. 3, fn. 2.

laws as "background laws," the Court cited the Supreme Court's recent holding in *Ginsberg* that a Minnesota state common-law claim for breach of the duty of good faith and fair dealing, despite being a generally-applicable common-law tort, "'clearly' satisfied the 'related-to' test" for purposes of preemption. *Id.* at 16-17.

Second, the Court rejected the argument that a finding of FAAAA preemption requires empirical proof of actual damages caused by enforcement of the challenged state law. Citing the Supreme Court's holding in *Rowe*, the Court explained that "[w]e have previously rejected the contention that empirical evidence is necessary to warrant FAAAA preemption, and allowed courts to 'look[] to the logical effect that a particular scheme has on the delivery of services or the setting of rates." *Id.* at 21 (quoting *Rowe*, 448 F.3d at 82 n.14). The Court emphasized that such a logical-but-not-empirically-proven effect on a carrier's prices, routes, or services "can be sufficient, even if indirect[.]" *Id.*[7] In the wake of the First Circuit's ruling in *Mass. Delivery Ass'n.*, two other district courts have likewise concluded that Section 148B is preempted by the FAAAA. *See Remington v. J.B. Hunt Transport, Inc.*, 2015 U.S. Dist. LEXIS 13825 (D. Mass., Feb. 5, 2015), *Schwann v. FedEx Ground Package System, Inc.*, 2015 U.S. Dist. LEXIS 13826 (D. Mass., Feb. 5, 2015).

Previously, Section 148B had been held to be preempted in *Sanchez v. Lasership, Inc.*, 937 F.Supp.2d 730 (E.D. Va. 2013). In *Lasership*, the Court noted that "a vast majority of

---

[7] The Court also engaged in a lengthy analysis of whether the plaintiff courier service was engaged in the "transportation of property," as required to fall within the ambit of the FAAAA. *Id.* at 22-23. In that case, the District Court had ruled that Section 148B "failed to relate sufficiently to the transportation of property," relying on the Supreme Court's holding *Dan's City*. *Id.* at 22. The First Circuit also rejected this conclusion, clarifying that the FAAAA's requirement that a preempted law "regard … the transportation of property," the Court concluded that, given the potential impact upon the plaintiff delivery company's services, prices, and routes, Section 148B "clearly concerns a motor carrier's 'transportation of property.'" *Id.* at 23. As shown in this brief, it is undisputed that BeavEx is engaged in the transportation of property via motor carriage, and that Plaintiffs' contractual work for BeavEx specifically related to such transportation of property.

delivery businesses in Massachusetts … operates entirely through contractual relationships with its drivers because using independent contractors enables it to provide certain services, such as on-demand services or as-needed deliveries," and that "[t]he availability of on-call contractors enables Lasership to efficiently meet its customers' demands." *Id.* at 744.   The Court specifically distinguished Section 148B from the anti-bribery and anti-corruption statutes this Court had found to not be preempted in *S.C. Johnson & Son*, reasoning that those statutes (unlike Section 148B) did not "directly chang[e] the business models of motor carriers by dictating that they discontinue the use of certain employment relationships." *Id.* at 743.   In finding that Section 148B had a significant and, thus, preempted impact on Lasership's services, the Court explained that

> elimination of independent contractors, as defined by common law or statutes in neighboring states, triggers a number of other labor laws, such as to make this law more than simply a wage law. It becomes **an outline of how a business must be structured, an overhaul of any motor carrier business model attempting to meet customer demand through flexible design.** As here, a complete overhaul of a motor carrier's business model is disruptive to the carriage itself and falls within the scope of conduct the FAAAA intended to prevent. Compliance with Massachusetts's independent contractor law fundamentally alters the essence of [defendant]'s business model that relies on independent contractors who can make on-demand deliveries required by market forces and modern customer demand.

*Sanchez v. Lasership, Inc.*, 937 F.Supp.2d 730, 743 (E.D. Va. 2013) (emphasis added).

The rulings in *American Trucking Associations*, *Lasership*, *Mass. Delivery Ass'n.*, *Remington*, and *Schwann* lay a foundation of consistent, well-reasoned precedent standing for the principle that states' efforts to limit or ban motor carriers' and other employers' use of independent contractors, or compel them to replace their existing independent-contractor-based service models with employee-based ones, are preempted by the FAAAA.   All but one of these five rulings dealt with Section 148B of the Massachusetts Independent Contractor Statute, a state law whose operative language is substantially identical to the IWPCA provision at issue in the

present case. So although the question of whether the IWPCA's independent contractor provisions are preempted by the FAAAA is one of first impression for this Court, the Court will not be writing on a completely blank slate.

Having established the broad reach of the FAAAA's preemption provision, and considered its application to state law substantially identical to the IWPCA's limits on the use of independent contractors, we now turn to the facts of the present case.

## II.    The FAAAA Preempts The IWCPA As to BeavEx.

### A.    Enforcing The IWPCA Against BeavEx Would Substantially Impact BeavEx's Services and Routes.

Plaintiffs are correct when they contend that enforcing the IWPCA against BeavEx would shift many significant business costs from the couriers to BeavEx. DE 77, ¶¶ 45-53. These increased costs would have a far-reaching financial impact on BeavEx's business, rendering the company unable to profitably provide its on-demand service to its clients, which would force BeavEx to cease offering those services. 63-1, ¶ 10. Put another way, applying the IWPCA to BeavEx's business model would override the competitive market forces which permit the company to provide on-demand services and non-regularly-scheduled routes using an independent-contractor-based business model. This alone is sufficient to trigger FAAAA preemption, because enforcing the IWPCA would substantially impact—and would, in fact, eliminate—the on-demand courier services BeavEx currently provides. *See Rowe*, 552 U.S. at 372 ("the [IWPCA] thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide); *Lasership*, 937 F.Supp.2d at 745 ("The statute's enforcement against Lasership requires it to discontinue its on-demand services, which 'would require changes in the way the service is

provided'") (quoting *DiFiore*, 646 F.3d at 88); *accord Treiber & Staub, Inc. v. UPS*, 474 F.3d

379, 387 (7th Cir. 2007) (a state rule that "would compel a certain kind of service … would, in

effect, be a rule having the force and effect of law relating to rates, routes or services[.]").

> **B.    Enforcing the IWPCA Against BeavEx Would Substantially Impact
>         BeavEx's Prices.**

Similarly, shifting the cost of owning and maintaining vehicles, paying for various

required forms of insurance, and other expenses from BeavEx's couriers to BeavEx, and

imposing upon BeavEx the costs and burdens associated with converting over a hundred

contractors to employees, will logically have a significant impact on BeavEx's prices. As

detailed above, if BeavEx were obligated to revamp its business model by converting its couriers

to employees, its labor costs would increase substantially. Likewise, compelling BeavEx to

provide, store, and maintain vehicles sufficient to support the number of couriers who staff its

routes would impose a massive additional financial burden upon BeavEx.  These additional costs

would directly and inevitably impact the prices BeavEx must charge its customers to remain

profitable. Basic economics holds that prices are set where the supply curve intersects the

demand curve; when the cost of providing a service increases, the supply curve shifts up and to

the left, resulting in higher prices. *See Lasership*, 937 F.Supp.2d at 748  ("Anything that changes

production costs will shift the supply curve, and hence will result in a new equilibrium price")

(quoting Ben S. Bernanke & Robert H. Frank, PRINCIPLES OF MICROECONOMICS 57 (3d ed.

2007)). Stated differently, a for-profit business cannot continue to charge the same price if it is

required to suddenly bear the burden of significant new business costs. *Id.* ("Consistent with

basic economics, therefore, the high costs incurred by [820 ILCS 115/2's] compliance will

undoubtedly have to be recouped by raising prices.") Because enforcement of the IWPCA would

necessarily and logically cause BeavEx to increase its prices, the statute is preempted by the FAAAA.

### C.     The District Court Erred In Denying BeavEx's Motion for Summary Judgment on FAAAA Preemption

In its Memorandum Opinion and Order denying BeavEx's Motion for Summary Judgment, the District Court's ruling was guided by two erroneous conclusions.  First, the Court incorrectly categorized the IWPCA as a mere "background law" and a "generic prevailing wage law" that "affects BeavEx only as a member of the public," concluding that "the Court finds no evidence that Congress set out to preempt these generic prevailing wage laws."  RSA.012.  But the District Court's reasoning on this point was identical to the rationale the First Circuit soundly rejected in *Mass. Delivery Ass'n*. There, the Court not only refused to lump "general State employment statutes" into the "background law" category (a classification it described as "not…particularly helpful"), but pointed out that less than a year ago, the Supreme Court held that a generic law, applicable to the defendant airline only as a member of the general public, was preempted by the ADA.  *See Ginsberg*, 134 S.Ct. at 1430 ("What is important … is the effect of a state law, regulation, or provision, not its form[.]"); *see also S.C. Johnson & Son.*, 697 F.3d at 558 (Wisconsin common-law claims of fraudulent misrepresentation and conspiracy to commit fraud preempted by FAAAA), *Travel All Over the World*, 73 F.3d at 1434 (tortious interference, intentional infliction of emotional distress, and fraud claims preempted by ADA). The Court's ruling in *Mass. Delivery Ass'n.* (that a law Plaintiffs' counsel has repeatedly described as "nearly identical" is preempted by the FAAAA) and similar rulings by the District Courts in *American Trucking Association*, *Lasership*, *Remington*, and *Schwann* all give lie to and cast the District Court's conclusion that there is "no evidence that Congress set out to preempt these generic prevailing wage laws."

29

In any event, the District Court's ruling ignores the logical impact of the IWPCA on businesses like BeavEx. The District Court's description of that law as a "state employee compensation statute," RSA.009, a "prevailing wage law," RSA.012, and a law that "applies to all employers and employees in Illinois," *id.*, indicates the fatal flaw in the Court's logic on this point. The IWPCA does not simply impose generally-applicable requirements on BeavEx's ten Illinois employees. To the contrary, by its terms it specifically <u>defines</u> <u>as</u> <u>employees</u> over a hundred additional individuals who voluntarily chose to enter into a <u>non</u>-employment, independent contractor relationship with BeavEx. In essence, the IWPCA's independent contractor provisions require BeavEx to either convert its independent contractor couriers to employees, cease offering courier services altogether, or violate the law. The IWPCA does not merely act as a background law regulating BeavEx's employment relationships; it goes a step further, and <u>mandates</u> <u>the</u> <u>creation</u> <u>of</u> employment relationships. As the Court in *Lasership* aptly put it, such a law is "more than simply a wage law. It [is] an outline of how a business must be structured, an overhaul of any motor carrier business model attempting to meet customer demand through flexible design." 937 F.Supp.2d at 743. Such a mandatory change to the essence of BeavEx's business model clearly "relates to" how BeavEx chooses to offer its services, and has a significant impact upon those services and, ultimately, the prices BeavEx must charge for them.

The second error guiding the District Court's summary judgment ruling was its conclusion that, in order to show the IWPCA is "related to" BeavEx's prices, routes, or services, BeavEx was required to offer "evidence of actual economic changes that would occur" if that law were enforced, including "numerical calculations of the effect enforcement of the IWPCA would have on its business." RSA.013. The Court's conclusion was erroneous. As the Supreme Court made clear in *Rowe*, such evidence is not required for a showing of preemption; to the

contrary, the Court dismissed the argument that proof of actual economic impact is a necessary prerequisite to a finding of preemption as "off the mark," pointing to the fact that, in that case, the significant impact of the challenged law would be to "freeze in place and immunize from competition a service-related system that carriers do not (or in the future might not) wish to provide. 552 U.S. at 373. As the Court in *Rowe* noted, "to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules and regulations," thus creating a "state regulatory patchwork [that] is inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Id.*

The First Circuit in *Mass. Delivery Ass'n.* cited *Rowe* on this very point in finding Section 148B to be preempted. As the First Circuit explained, "[w]e have previously rejected the contention that empirical evidence is necessary to warrant FAAAA preemption, and allowed courts to 'look[] to the logical effect that a particular scheme has on the delivery of services or the setting of rates." 769 F.3d at 21 (quoting *Rowe*, 448 F.3d at 82 fn. 14). The Court further held that "this logical effect can be sufficient even if indirect." *Id.*

As explained in detail above, the logical effects of enforcing the IWPCA against BeavEx are numerous and significant. Setting aside BeavEx's proof that it would incur roughly $185,000 in additional expenses by being forced to recruit, hire, and train an Illinois-based human resources professional to administer the dozens of employees BeavEx would be forced to hire from its contractor ranks, it is undisputed that BeavEx would also be legally obligated to incur the expense of paying payroll taxes, purchasing workers compensation and medical insurance, and contributing to unemployment insurance for each of those new employees. Additionally, in their own pleadings, Plaintiffs ask not only to be compensated for these categories of benefits,

but also specifically demand that BeavEx be required to purchase or lease automobiles for its couriers, and store and maintain those. Common sense and simple logic suggest that such measures would cause BeavEx to incur hundreds of thousands of dollars, at a minimum, in additional expenses that it does not currently bear.

These two errors by the District Court resulted in the creation of a true outlier: that is, a federal court ruling that a law prohibiting or limiting companies' use of independent contractors, and mandating that motor carriers who use such contractors to deliver their goods must change their service models to an employee-based delivery system, is <u>not</u> preempted. But since the Court issued its ruling, the Supreme Court's opinion in *Ginsberg* and the First Circuit's opinion in *Mass. Delivery Ass'n.* have added further guidance as to those areas of its summary judgment analysis in which the District Court erred. Those two rulings make clear that the District Court's denial of BeavEx's motion for summary judgment was error, and should be reversed.

### D.     Plaintiffs Are Attempting To Substitute A State Policy, Embodied In The IWPCA, For Their Contractual Agreements With BeavEx.

As a final point, the aforementioned line-drawing analysis of *S.C. Johnson* can be applied as a check on this preemption conclusion. That is, the Court should ask whether Plaintiffs seek to substitute a state-mandated policy (in the form of the IWPCA's prohibitions on certain uses of independent contractors) in place of the terms of their independent contractor agreements with BeavEx, or whether the IWPCA simply sets a basic, generally-applicable rule for a civil society. As explained at length above, Plaintiffs in this case, who contractually agreed to an independent contractor relationship with BeavEx, are now seeking to have the state of Illinois substitute its policy mandate in place of those agreements.

The IWPCA easily fails the *S.C. Johnson & Son* "basic rules for a civil society" inquiry. Much like the preempted tort claims at issue in that case, no consensus exists among the states

regarding the amount of regulation that should be applied to employers' use of independent contractors to perform core business functions. In fact, Massachusetts and Illinois are currently the only two states to legislatively impose such narrow, prohibitive, and absolute restrictions on the use of independent contractors to perform work that falls within the employer's usual course of business. The practical effect of this disparity in the law is that BeavEx and other businesses that utilize independent contractors would, if the Massachusetts and Illinois laws are not preempted, be required to either transform their entire national business model, or maintain different business models for those two states than they do for the rest of the nation. This is exactly the sort of "patchwork" of random state law claims Congress sought to avoid, post-deregulation, when it passed the FAAAA. *See* H.R. Rep. p. 87, 1994 U.S.C.C.A.N. at 1759 ("The sheer diversity of these regulatory schemes is a huge problem for national and regional carriers attempting to conduct a standard way of doing business."). But more than that, Illinois's status as an extreme outlier in this area completely undercuts any suggestion that a state's micromanagement of its independent contractors' relationships is a basic rule of a civilized society, sufficient to avoid preemption. *See S.C. Johnson*, 697 F.3d at 557 ("one state's deceptive practice might be another state's hard bargain," and "[t]he amount (if any) of necessary regulation is hotly debated (thus, the wide variance in these laws from state to state).").

## CONCLUSION

By its terms, the Illinois Wage Payment and Collection Act's definition of "employee" makes it unlawful for BeavEx to engage and contract with independent contractors to perform the courier delivery services that are the essence of BeavEx's business. Instead, the IWPCA mandates that, at least in Illinois, BeavEx must hire and use employees to perform those services, or otherwise not perform them at all. The IWPCA's prohibition on the use of independent contractors relates directly to the essence of BeavEx's business and would, if enforced, substantially impact the very model by which BeavEx provides its core services, and the prices at which it can and must provide them. This sort of state-level interference with the prices, routes, and services of a motor carrier is expressly prohibited by the preemption provisions of the Federal Aviation Administration Authorization Act of 1994, and is the very reason Congress passed that law in the first place. By refusing to find as a matter of law that the IWPCA's independent contractor provisions are preempted by the FAAAA, the District Court erred.

For these reasons, and for all the reasons set forth above, BeavEx respectfully requests that this Court reverse the judgment of the District Court, grant summary judgment in BeavEx's favor on the question of whether the FAAAA preempts the IWPCA's independent contractor provisions, and remand this case for entry of final judgment in favor of BeavEx.

## STATEMENT CONCERNING ORAL ARGUMENT

Pursuant to Circuit Rule 34(f), BeavEx respectfully requests oral argument. Oral argument is appropriate under the criteria of Fed. R. App. P. 34(a) because:

(1)    This appeal is not frivolous because both the District Court and this Court certified this matter for interlocutory appeal pursuant to 28 U.S.C. § 1292;

(2)    The dispositive issue of FAAAA preemption of the Illinois Wage Payment and Collection Act has not been authoritatively decided by this Court or by the Supreme Court; and

(3)    The decisional process would be significantly aided by oral argument, because this case presents an issue of first impression (FAAAA preemption of the Illinois Wage Payment and collection Act) and because the relevant body of guiding Supreme Court and Circuit precedent is relatively minimal.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,117 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 12 point Times New Roman font.

*/s/ Kevin M. Duddlesten*
Kevin M. Duddlesten

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on ___March 6, 2015___, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ ___Kevin M. Duddlesten___

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                              address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

s/ _____

No. 15-1110

IN THE

𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔖𝔢𝔳𝔢𝔫𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

---

BEAVEX, INC.,

*Defendant-Appellant, Cross-Appellee*

v.

THOMAS COSTELLO, MEGAN BAASE KEPHART,
OSAMA DAOUD, et al., individually and on behalf
of all others similarly situated

*Plaintiffs-Appellees, Cross-Appellants.*

---

On Petition for Interlocutory Appeal from an Order of the United
States District Court for the Northern District of Illinois

Case No. 12-cv-7843
The Honorable Judge Virginia M. Kendall

---

**REQUIRED SHORT APPENDIX
OF DEFENDANT-APPELLANT**

---

MCGUIREWOODS, LLP

Kevin M. Duddlesten
2000 McKinney Ave., Suite 1400
Dallas, Texas 75201
Telephone: 214.932.6419

Brian E. Spang
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601
Telephone: 312.750.3532

W. Joseph Miguez
816 Congress Ave., Suite 940
Austin, Texas 78701
Telephone: 512.617.4524

*Counsel for Defendant-Appellant, Cross-Appellee*

## TABLE OF CONTENTS

| Date Filed | Docket Text | Page # |
|---|---|---|
| 03/31/2014 | [Dkt #95] **Memorandum Opinion and Order**: For the foregoing reasons, BeavEx's motion for summary judgment and the Plaintiffs' motion for class certification are denied, and the Plaintiffs' motion for partial summary judgment is granted as to the named plaintiffs | RSA.001-029 |
| 10/29/2014 | [Dkt #139] **Order**: The Plaintiffs' Motion for Reconsideration (DE 98) and the Defendant's Motion for Reconsideration (DE 104) are denied. The Plaintiffs Motion to Grant Notice of the Denial of Class Certification (DE 96) is dismissed without prejudice | RSA.030-035 |
| 08/10/2005 | 49 USCA § 14501. Federal authority over intrastate transportation. | RSA.036-037 |
| 07/14/2006 | IL ST CH 820 § 115/2. Definitions. | RSA.038-039 |

## STATEMENT

All of the materials required by parts (a) and (b) of Circuit Rule 30 are included in this Required Short Appendix.

*/s/ Kevin M. Duddlesten*
Kevin M. Duddlesten

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS COSTELLO, MEGAN BAASE KEPHART, AND OSAMA DAOUD, ET AL., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | No. 12 C 7843 |
| | ) | |
| Plaintiffs, | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| BEAVEX INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Thomas Costello, Megan Baase Kephart, Osama Daoud, and the class they seek to represent, worked for Defendant BeavEx, Inc., a courier company, as delivery drivers. The Plaintiffs brought the instant three-count Complaint on January 11, 2013 alleging that BeavEx unlawfully classified its delivery drivers as "independent contractors" when they should have been deemed "employees" under both Illinois statutory and common law. (Dkt. No. 34). This misclassification allegedly resulted in (1) deprivation of overtime wages in violation of the Illinois Minimum Wage Law ("IMWL"); (2) illegal deductions taken from the Plaintiffs' wages in violation of the Illinois Wage Payment and Collection Act ("IWPCA"); and (3) unjust enrichment of BeavEx. Specifically in Count II, the Plaintiffs allege that BeavEx unlawfully took deductions from their pay in order to fund uniforms, cargo insurance, workers' accident insurance, administrative fees, scanner fees, and cellular phone fees in violation of the IWPCA that would not have occurred were the Plaintiffs properly classified as "employees." *See* 820 ILCS 115/9. BeavEx moves for  summary judgment claiming  that the Federal Aviation

Administration Authorization Act of 1994 ("FAA") preempts the IWPCA because the FAA expressly preempts a State from enacting or enforcing a law related to a price, route, or service of any motor carrier. *See* 49 U.S.C. § 14501(c)(1). The Plaintiffs filed for summary judgment on Count II claiming that  BeavEx cannot satisfy the IWPCA independent contractor exception to wage deductions based on the undisputed facts while concurrently moving the Court to certify this case as a class action pursuant to Fed. R. Civ. Pro. 23. For the reasons set forth below, BeavEx's motion for summary judgment and the Plaintiffs' motion for class certification are denied, and the Plaintiffs' motion for summary judgment on Count II is granted as to the named plaintiffs.

## STATEMENT OF MATERIAL UNDISPUTED FACTS[1]

Each of the parties to the present dispute has moved for summary judgment in their respective favor. Therefore, the Plaintiffs submitted a statement of undisputed material facts in support of their partial motion for summary judgment as well as a response to BeavEx's statement of undisputed material facts. Further, a majority of the undisputed material facts submitted by BeavEx are supported solely by the Declaration of Sandra Foster, the Senior Vice President for BeavEx. There are numerous statements throughout Foster's declaration that constitute statements of opinion and arguments, not statements of fact, contrary to Local Rule 56(a)(3). *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts.") (internal citations omitted); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (a party's statement of material facts submitted pursuant to Local Rule 56.1 is improper where it fails to

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to BeavEx's Statement of Material Facts (Dkt. 63) have been abbreviated to "Def. 56.1 St. ¶ __"; citations to the Plaintiffs' Response to Defendant's Statement of Material Facts (Dkt. 68) have been abbreviated to "Pl. Resp. 56.1 St. ¶ __"; and citations to the Plaintiffs' Statement of Material Facts (Dkt. 77) have been abbreviated to " Pl. 56.1 St. ¶ __."

RSA.002

cite to the record and is "filled with irrelevant information, legal arguments, and conjecture").

The purpose of Local Rule 56.1 statements of facts is to identify the relevant admissible evidence

supporting the material facts that each party contends require either the granting or the denial of

summary judgment. *See Markham v. White*, 172 F.3d 486, 490 (7th Cir. 1999) (the local rules

governing summary judgment "assist the court by organizing the evidence, identifying

undisputed facts, and demonstrating precisely how each side proposes to prove a disputed fact

with admissible evidence."). It is improper for a litigant to include legal or factual conclusions,

arguments, or conjecture in a statement of material facts and accordingly, statements constituting

such will be ignored by the Court.[2]

Background

BeavEx is one of the largest courier companies in the nation and its primary function is to

perform same-day delivery service for clients across the country including in Illinois. (Pl. 56.1

St. ¶ 1, Ex. A; Def. 56.1 St. ¶ 1). BeavEx provides these delivery services for compensation

through drivers classified as independent contractors by BeavEx, who drive their own vehicles.

(Def. 56.1 St. ¶ 3, Pl. 56.1 St. ¶ 6). Plaintiffs and the class they seek to represent comprise a

group of approximately 825 courier drivers who performed delivery services for BeavEx in

Illinois from October 1, 2002 to the present. (Pl. 56.1 St. ¶ 3). BeavEx offers its clients both

scheduled-route and on-demand delivery services. (Def. 56.1 St. ¶ 4). With regard to scheduled-

route services, BeavEx clients dictate regular times and locations that pick-ups and drop-offs

must be made, which are communicated to drivers through a manifest listing that day's delivery

route information, including customer names, locations, order of deliveries, and a specified time

for each delivery. (*Id.* at ¶ 5; Pl. 56.1 St. ¶ 11). At this time, BeavEx has approximately 280

---

[2] While self-serving statements can be used to create disputes of fact, that is not what BeavEx attempts here. In this case, BeavEx utilizes self-serving statements as legal conclusions, arguing that summary judgment is proper. The Court is not convinced without more.

scheduled routes in Illinois that it coordinates on a regular basis. (Def. 56.1 St. ¶ 7). With regard to on-demand delivery services, BeavEx often receives calls from clients for rush deliveries which tend to be variable and unpredictable. (*Id.* at ¶ 9-10).

BeavEx currently employs nine full-time employees and one part-time employee in Illinois to handle administrative and warehouse duties. (*Id.* at ¶ 16). The employees are paid on an hourly or salary basis and receive health insurance and other benefits. (Def. 56.1 St. ¶ 17). BeavEx also provides workers' compensation insurance, pays payroll taxes, and makes unemployment insurance contributions for its employees. (*Id.* at ¶ 18). BeavEx classifies its drivers as independent contractors as opposed to employees. (Pl. 56.1 St. ¶ 6). The drivers are paid by route for each delivery completed, instead of by hours or weeks worked, and do not receive benefits such as health insurance or workers' compensation. (Def. 56.1 St. ¶ 19-20). Nor does BeavEx pay drivers' payroll or unemployment insurance taxes. (*Id.* at ¶ 21). BeavEx uses drivers who are incorporated and others who are not, and some who utilize subcontractors to complete scheduled routes which are bid on and accepted by the driver. (*Id.* at ¶ 39). BeavEx does not prohibit or discourage its drivers from utilizing subcontractors, but drivers cannot engage a subcontractor or replacement driver without approval from BeavEx. (Def. 56.1 St. ¶ 40; Pl. 56.1 St. ¶ 31, Ex. E, F, and G).

Drivers' Operations

BeavEx drivers generally begin their shift by reporting to one of BeavEx's office locations. (Pl. 56.1 St. ¶ 8). Drivers use their own vehicles to provide the delivery service. (Def. 56.1 St. ¶ 29). Drivers are required to wear apparel with the BeavEx logo when performing deliveries and their cars are required to have the BeavEx name, logo, phone number, and Illinois Commerce Commission number on both sides. (Pl. 56.1 St. ¶14-15, Ex. D, E, F, and G). BeavEx

4

drivers operate their assigned routes under BeavEx's Illinois motor carrier number, and in order

to utilize this number, drivers are required to lease their personal vehicles to BeavEx. (*Id.* at ¶ 32-

33). Further, drivers are required to use scanners and record logs to make a record upon delivery

of a package. (*Id.* at ¶ 16). BeavEx manages all communications with customers, however. (*Id.* at

¶ 20).   BeavEx also has authority to discipline or terminate drivers who violate its policies

through either an accumulation of minor breaches or one major breach. (*Id.* at ¶ 38-41).

<u>Owner/Operator Agreement and Contract Management Services Contract</u>

As a precondition of employment, all BeavEx drivers are required to sign both an

Owner/Operator Agreement, which classifies drivers as independent contractors, and a contract

with Contract Management Services ("CMS"). (*Id.* at ¶ 7 and 46). Under the owner/operator

agreements, a driver can be terminated any time for any improper conduct. (*Id.* at ¶ 42). Further,

if a customer stops contracting with BeavEx, BeavEx may terminate the driver's contract

assigned to that customer's route. (*Id.* at ¶ 44, Ex. E, F, and G). Under the CMS agreements,

BeavEx takes various deductions from drivers' pay, including deductions for occupational

accident insurance, cargo insurance, uniforms, scanners, and "chargebacks." (*Id.* at ¶ 45, Ex. P,

Q, and R). The drivers purchase both the occupational accident insurance and cargo insurance

through BeavEx and CMS. (*Id.* at ¶ 48-49). BeavEx also takes deductions from drivers' pay for

scanners, uniforms, phone chargers, CMS processing fees, and "chargebacks" if BeavEx

determines a driver failed to satisfactorily complete a delivery. (*Id.* at ¶ 50-53).

<u>The IWPCA and the FAAAA</u>

The Plaintiffs bring their claim under Count II relying on the language of the IWPCA.

The IWPCA provides that:

> deductions by employers from wages or final compensation are prohibited unless
> such deductions are (1) required by law; (2) to the benefit of the employee; (3) in

5

response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made; (5) made by a municipality with a population of 500,000 or more…or (6) made by a housing authority in a municipality with a population of 500,000 or more…

820 ILCS 115/9. The IWPCA applies to all employers and employees in Illinois. *See* 820 ILCS 115/1. The term "employee" does not include any individual:

(1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and (3) who is in an independently established trade, occupation, profession or business.

820 ILCS 115/2. This is commonly referred to as the independent contractor exception. The Defendants, on the other hand, base their motion for summary judgment on the preemption clause found in the FAAAA. Congress enacted the FAAAA in 1994 to address deregulation of the trucking industry. The FAAAA provides, in part:

[A] State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier…with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).

## STANDARD OF REVIEW

"Summary judgment is proper when, viewing all facts and inferences in favor of the nonmoving party, no genuine dispute as to material fact exists, and the moving party is entitled to judgment as a matter of law." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). Whether a fact is material depends on the underlying substantive law that governs the dispute. *Id.* And a genuine dispute is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citation omitted). Summary judgment is appropriate where the

RSA.006

moving party shows that the nonmoving party cannot prove an element essential to its case. *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). Where the moving party has properly supported its motion, the nonmoving party must come forward with facts that show there is a genuine issue for trial. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013).

## DISCUSSION

**I. BeavEx's Motion for Summary Judgment**

### A. Preemption

BeavEx's motion for summary judgment claims there is preemption of the IWPCA based on FAAAA section 14501. If this federal statute preempts the Plaintiffs' unlawful deduction claim, then Count II of the Complaint must fail and summary judgment is proper.

The constitutional basis for federal preemption is the Supremacy clause, which states, "[The Laws of the United States…shall be the supreme Law of the Land[.]" U.S. Const. Art. VI, Cl. 2. When considering preemption, a court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Accordingly, the "purpose of Congress" is the ultimate touchstone of preemption analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).

To understand Congress' purpose, the first consideration is the text of the federal law, in this case, § 14501(c). In relevant part, it states:

> (1) General rule.—Except as provided in paragraphs (2) and (3), as State…may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier…with respect to the transportation of property.*

7

**RSA.007**

49 U.S.C. § 14501(c) (emphasis added). Section 14501 had its genesis in the Airline Deregulation Act of 1978 (ADA), 92 Stat. 1705, which "largely deregulated the domestic airline industry." *See Dan's City Used Cars, Inc. v. Pelkey*, 133 S.Ct. 1769, 1775 (2013). The ADA aimed to "ensure that states would not undo federal deregulation with regulation of their own." *Id.* (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992)). To safeguard this, the ADA included a preemption provision which prohibited states from enacting or enforcing any law "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). Two years later, Congress deregulated the trucking industry using largely the same language as the ADA. *See* Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793.

Congress additionally limited the states' ability to regulate trucking by enacting the FAAAA of 1994 (addressing air and motor carriers). "Borrowing from the ADA's preemption clause, but adding a new qualification,…the FAAAA supersedes state laws 'related to a price route, or service of any motor carrier…*with respect to the transportation of property.*'" *Dan's City*, 133 S.Ct. at 1774 (quoting 49 U.S.C. § 14501(c) and adding emphasis). That added phrase "'massively limits the scope of preemption' ordered by the FAAAA.'" *Id.* at 1778 (quoting *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 449 (2002) (Scalia, J. dissenting)). Under this restriction, "it is not sufficient that a state law relates to the 'price, route, or service' of a motor carrier in any capacity; the law must also concern a motor carrier's 'transportation of property.'" *Id.* Because of the similarity of the preemption provisions contained in the FAAAA and ADA, cases interpreting the ADA will be equally instructive and controlling here. *See Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364, 370 (2008) (*quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("when judicial interpretations have settled the meaning of an existing statutory provision,

RSA.008

repetition of the same language in a new statute indicates as a general matter, the intent to incorporate its judicial interpretations as well")).

The FAAAA preempts a state law (1) whenever the state law actually references the rates, routes, or services of carriers or (2) if it has a "significant impact" on Congress' deregulatory objectives. *See Morales*, 504 U.S. at 384 (the critical phrase, "relating to," expresses "a broad pre-emptive purpose"); *Rowe*, 552 U.S. at 371 (preemption occurs at least where state laws have significant impact related to Congress' deregulatory and preemption-related objectives); *see also Travel All Over the World, Inc. v. Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996) (state law is preempted by FAAAA whenever that law expressly refers to rates or has a significant impact on them). Conversely, a state law will not be preempted if it affects federal goals "in only a tenuous, remote, or peripheral…manner." *Dan's City*, 133 S. Ct. at 1778 (*quoting Morales*, 504 U.S. at 390); *S.C. Johnson & Son, Inc. v. Transport Corp. of America, Inc.*, 697 F.3d 544, 550 (7th Cir. 2012) (discussing *Morales* and its lesson that preemption is not "a simple all-or-nothing question").

### B. Application

BeavEx can therefore show preemption is warranted either by pointing to an explicit reference to rates, routes, or services of motor carriers in the language of the IWPCA or by showing the IWPCA will have a significant economic effect upon them. *See United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 609 (7th Cir. 2000). Neither the Supreme Court nor the Seventh Circuit has ever held that a state employee compensation statute is preempted by either the ADA or the FAAAA. Moreover, nearly all of the cases relied upon by BeavEx in its memorandum in support of its motion involve laws and provisions either directly aimed at airline and motor carriers or directly related to airline or motor carrier activity. *See generally Rowe*, 552

RSA.009

U.S. at 367 (law regulated the delivery of tobacco to customers within the state); *Morales*, 504

U.S. at 374 (guidelines contained detailed standards governing the content and format of airline

fare advertising); *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046,

1048 (9th Cir. 2009) (mandatory concession agreements specifically for drayage trucking

services); *Missing Link Jewelers, Inc. v. United Parcel Service, Inc.*, No. 09 C 3539, 2009 WL

5065682 at *1 (N.D. Ill. Dec. 16, 2009) (challenge of late fees assessed). In this case, the

IWPCA does not reference motor carriers and therefore has no direct connection to BeavEx's

rates, routes, or services. In order to succeed with its preemption defense, BeavEx must

demonstrate that the Plaintiffs' claim has a sufficient economic effect on its prices, routes, or

services to warrant its preemption. *See Travel All Over the World*, 73 F.3d at 1432 (claim is

preempted if *either* the state rule expressly refers to rates, routes, or services, or application of

the state's rule would have significant economic effect upon them).

BeavEx contends that, as applied, the IWPCA claim is preempted because "if [drivers]

are engaged as employees and given an hourly rate, benefits and mileage, the cost of labor would

increase substantially." BeavEx correctly states that the FAAAA may preempt the Plaintiffs'

claims even if the "state law's effects on rates, routes or services 'is only indirect.'" *Rowe*, 552

U.S. at 370 (*quoting Morales*, 504 U.S. at 386). However, the FAAAA's preemption provision

does not have infinite reach.

BeavEx's argument that the FAAAA preempts an Illinois wage law because it might

indirectly impact BeavEx's prices and rates is tantamount to arguing immunity from all state

economic regulation. *See Rowe*, 552 U.S. at 375 (FAAAA does not generally preempt state

regulation that broadly prohibits certain forms of conduct and affects motor carriers only in their

capacity as members of the public); *see also S.C. Johnson*, 697 F.3d at 558 ("Changes to these

10

background laws will ultimately affect the costs of labor inputs and in turn, the 'price…or service' of the outputs. Yet no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws because their effect on price is too 'remote.' Instead, laws that regulate these inputs operate one or more steps away from the moment at which the firm offers its customer a service for a particular price."); *see, e.g., Difiore v. American Airlines, Inc.*, 646 F.3d 81, 89 (1st Cir. 2011) (state regulation is not preempted wherever it imposes costs on carriers and therefore affects rates because costs "must be made up elsewhere, *i.e.*, other prices raised or charges imposed" as that would effectively exempt carriers from state taxes, state lawsuits, and most state regulation of any consequence).

Without controlling law in this Circuit, the Court looks elsewhere for illustrations and finds the First Circuit's reasoning in *DiFiore* persuasive. A class of skycaps challenged American Airlines' curbside baggage check fee, claiming that it violated the Massachusetts Tip Law. *DiFiore*, 646 F.3d at 81. The statute provided, in pertinent part, that "[n]o employer or other person shall demand…or accept from any…service employee…any payment or deduction from a tip or service charge given to such…service employee…by a patron." *Id.* at 84; Mass. Gen. Laws ch. 149, § 152A(b). In concluding that the Tips Law claim was preempted by the ADA, the court distinguished the Tips Law from other employee compensation laws:

> The dividing line turns on the statutory language "related to a price, route, or service." Importantly, the tips law does more than simply regulate the employment relationship between the skycaps and the airline…the tips law has a *direct connection* to air carrier prices and services and can fairly be said to regulate both. As to the latter, American's conduct in arranging for transportation of bags at curbside into the airline terminal en route to the loading facilities is itself a part of the "service" referred to in the federal statute, and the airline's "price" includes charges for such ancillary services as well as the flight itself.

*Id.* at 87. The court noted that the Supreme Court would be unlikely to free carriers from most conventional common law claims for tort, from prevailing wage laws, and ordinary taxes

**RSA.011**

applicable to other businesses, even though such measures necessarily affect fares and services. *Id.* Because the Tip law directly regulated how an airline service was performed and how price was displayed, it went beyond regulating the airline as an employer or proprietor. *Id.* at 88.

The IWPCA is easily distinguishable from the Massachusetts Tip Law and instead fits the mold of a "background law." The law applies to all employers and employees in Illinois and lays out guidelines for, among other things, pay periods, deductions from wages, and avenues to pursue in the event of employment disputes. *See generally* 820 ILCS 115. Not only does the law avoid targeting motor carriers, it only applies to the employment relationship between employers and employees in general, therefore operating at least a step away from the point that BeavEx offers services to customers. The IWPCA regulates the operation of the underlying employment relationship which plays a role in setting the market price, like all economic regulation necessarily does. This is not sufficient to support preemption. *See S.C. Johnson*, 697 F.3d at 558. The IWPCA simply standardizes the employment arena within Illinois. Considering its purpose and procedures, the IWPCA affects BeavEx only as a member of the public and the Court finds no evidence that Congress set out to preempt these generic prevailing wage laws.

Moreover, even if the IWPCA were not a "background law" outside the ambit of the FAAAA, BeavEx has failed to demonstrate the significant impact the law would have due to the vagueness with which it describes its potential increased costs. BeavEx's reliance on *Sanchez v. Lasership*, 937 F. Supp.2d 730 (E.D. Va. 2013) exemplifies the absolute dearth of evidentiary support BeavEx has provided regarding a significant impact finding. In *Sanchez*, the court found a Massachusetts wage statute was preempted by the FAAAA because of the impact compliance would have on the defendant's courier prices. *Sanchez*, 937 F. Supp.2d at 747. In support of its

12

argument, the defendant provided voluminous evidence of actual economic changes that would

occur were the Massachusetts wage law enforced:

> Lasership reports that its 2012 operating profit for its Massachusetts operations
> was $140,000. To offer health insurance to its employee-drivers, Lasership's costs
> would increase by $193,200 per ear. Providing workers' compensation insurance
> will cost Lasership up to $11.00 per $100.000 in earnings, ranging from $3,510 to
> $4,290 per driver each year. Thus, to provide workers' compensation insurance
> for all seventy of Lasership's current drivers, Lasership would incur costs ranging
> from $245,700 to $300,000. Additionally, independent contractors pay their own
> liability insurance, a cost that will be transferred to Lasership if it converts to an
> employee-based model. That cost alone is $196,000 per year. By the Court's
> estimation, Lasership's costs would increase by up to $689,200. This figure is
> nearly five times Lasership's profit margin for 2012.

*Id.* at 747-48.

Here, BeavEx has offered no numerical calculations of the effect enforcement of the

IWPCA would have on its business other than a claim that the creation of a human resources

department would incur $185,000 per year in labor costs. (Def. Rule 56.1 St. ¶ 33). As a

preliminary matter, the relevance of this number to the IWPCA inquiry is unknown as the law

imposes no such requirement on an Illinois employer. Even accepting that number as a legitimate

incurred cost, BeavEx offers no evidence other than unabashed conclusory statements that

compliance with the IWPCA will increase costs. BeavEx claims that if its drivers are engaged as

employees and given an hourly rate, benefits, and mileage, its costs of labor would increase

substantially.[3] (Def. Rule 56.1 St. ¶ 27). BeavEx offers zero facts in support of this conclusion. It

further asserts that converting couriers from independent contractors to employees would

dramatically increase its costs, "inescapably affecting its prices, routes and/or services." BeavEx

similarly leaves this contention unsubstantiated. In fact, BeavEx's entire argument regarding

significant impact is a regurgitation of the conclusory statements offered in the affidavit of

---

[3] The Plaintiffs partially undermine this contention by offering a concrete example. In one week of work in 2011,
Plaintiff Daoud received a total pay of $1,202.50 for approximately 66 hours of work. Were he treated as an
employee and given minimum wage as required by Illinois law, he would have received a total pay of $651.75.

**RSA.013**

Sandra Foster, the Senior Vice President for the company, and these opinions do not persuade the Court that summary judgment is proper. *See Diadenko v. Folino*, 741 F.3d 751, 757-58 (7th Cir. 2013) ("summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events"); *Stein v. Ashcroft*, 284 F.3d 721, 726 (7th Cir. 2002) (summary judgment requires more than vague, unsupported speculation and generalized allegations).

BeavEx had an opportunity to show the Court its operating profits utilizing its drivers as independent contractors and an estimation of these numbers were the drivers deemed employees. BeavEx could have offered its estimated change in customer rates due to increased costs. Instead, the company appears to attempt to meet its challenge of demonstrating a significant impact by relying on logic alone. Almost all state laws that affect a motor carrier's transportation business will have the kind of logical relation to its prices or services that BeavEx contends here. Wage and hour laws clearly have a logical relation to a carrier's prices and services because they necessarily affect the costs a motor carrier incurs. Laws of this type, however, are not ordinarily subject to preemption. *See Rowe*, 552 U.S. at 375. It is entirely plausible that imposition of the IWPCA will alter BeavEx's costs, but without any evidence whatsoever of what that alteration will constitute, it is impossible for this Court to make a determination of significant impact. Because no evidence has been introduced to confirm BeavEx's argument that the IWPCA will significantly impact its pricing and services, and for the reasons mentioned above, this Court finds that the IWPCA is not preempted by the FAAAA as it applies to BeavEx, and its motion for summary judgment is denied.

RSA.014

**II. Plaintiffs' Motion for Class Certification**

The decision to certify a class action rests within the discretion of the district court. *See*

*Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 471 (7th Cir. 1997). "[T]he party seeking

class certification assumes the burden of demonstrating that certification is appropriate." *Retired*

*Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). Whether a plaintiff has

met his burden is measured by the "preponderance of the evidence" standard. *See Messner v.*

*Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012).

A party may pursue its claim on behalf of a class only if it can establish that the four

threshold requirements of Federal Rule of Civil Procedure 23 are met: (1) the class is so

numerous that joinder of all members is impracticable (numerosity); (2) there are questions of

law or fact common to the class (commonality); (3) the claims or defenses of the representative

parties are typical of the claims or defenses of the class (typicality); and (4) the representative

parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ.P.

23(a).

If the Plaintiffs meet this initial burden, they must then show that the proposed class

satisfies one of the three requirements set forth in Rule 23(b). *See Oshana v. Coca-Cola Co.*, 472

F.3d 506, 513 (7th Cir. 2006). Where, as here, the Plaintiffs seek certification pursuant to Rule

23(b)(3), the Plaintiffs must show that "questions of law or fact common to the members of the

class predominate over any questions affecting only individual members (predominance), and

that a class action is superior to other available methods for fair and efficient adjudication of the

controversy (superiority)." Fed. R. Civ.P. 23(b)(3); *see also Messner*, 669 F.3d at 808, 814 n. 5.

In addition to the Rule 23 requirements, the Plaintiffs must also provide a workable class

**RSA.015**

definition by demonstrating that the members of the class are identifiable. *See Oshana*, 472 F.3d at 513.

### A. The Proposed Class

The Plaintiffs seek to certify a class comprising those who provided delivery driver services for BeavEx in Illinois and were not treated as employees. Perhaps realizing that there are certain deficiencies in the definition of the class proposed in the Complaint, the Plaintiffs offer an alternative class definition in their reply in support of their motion for class certification. The class defined in the complaint consists of "all persons who have provided delivery driver services directly to BeavEx in the State of Illinois at any time during the relevant statutory period, who were not treated as employees of BeavEx." (Dkt. No. 34 at ¶ 33).

In their reply in support of their motion for class certification, the Plaintiffs proposed the following alternative class definition: "All delivery drivers who contracted with BeavEx directly to perform deliveries who did so on a full time basis, and who had amounts deducted by BeavEx from their compensation checks." (Dkt. No. 93 at 15).

The Seventh Circuit has not addressed the scope of the Court's discretion to modify a class definition at the certification stage. Although a district court has the authority to modify a class definition at different stages in litigation, *see In re Motorola Securities Litigation*, 644 F.3d 511, 518 (7th Cir. 2011), district courts appear to be split on whether to hold a plaintiff to the class defined in the complaint. *Compare, e.g., Savanna Group, Inc. v. Trynex, Inc.*, No. 10 C 7995, 2013 WL 66181, at *2-3 (N.D. Ill. Jan. 4, 2013) (allowing amendment during certification proceedings and finding it consistent with Rule 23); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 09 C 5601, 2011 WL 4628744, at *2 (N.D. Ill. Sept. 30, 2011) (allowing amendment during certification proceedings); *with Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669,

16

672 n. 3, 680 n. 10 (N.D. Ill. 1989) ("As the Court observed earlier, the class definition proposed in [plaintiff's] motion for class certification differs from that set forth in her complaint. The Court has certified the class as originally proposed, but [plaintiff] may file an appropriate motion to amend both her complaint and the class definitions we have set forth here..."). In this case, the Court does not need to decide whether the amendment to the class definition is proper because the Plaintiffs fail to meet the standards of Rule 23 under either definition.

### B. The Plaintiffs Satisfy the Numerosity Requirement

Federal Rule of Civil Procedure 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class consisting of more than 40 members generally satisfies the numerosity requirement of certifying a class action. *See, e.g., Chavez v. Don Stolzner Mason Contractor, Inc.*, 272 F.R.D. 450, 454 (N.D. Ill. 2011); *cf Pruitt v. City of Chicago*, 472 F.3d 925, 926 (7th Cir. 2006). In an interrogatory response, BeavEx stated that during the relevant time period, there have been approximately 825 individuals who have provided courier services for BeavEx. BeavEx does not dispute, and thus concedes, that it would be impracticable to join this number of plaintiffs in the present action. Consequently, the Plaintiffs have met their burden regarding numerosity.

### C. The Plaintiffs Satisfy the Commonality and Typicality Requirements

Federal Rule of Civil Procedure 23(a)(2) requires that "questions of law or fact common to the class" exist. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)). "A common nucleus of operative fact is usually enough to satisfy" this requirement. *Id.* Typicality is closely related to commonality. *See id.* at 594. It requires "that the claims or defenses of the representative party be typical of the claims or defenses of the class." *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009) (quoting

*Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000)). This means the claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and…[the] claims are based on the same legal theory." *Oshana*, 472 F.3d at 514 (quoting *Rosario*, 963 F.2d at 1018).

The Plaintiffs have satisfied both the commonality and typicality requirements. Their claim arises from the same course of conduct that gives rise to the claims of the other class members and their claims are based on the same legal theory. Specifically, BeavEx classified the Plaintiffs and all other putative class members as independent contractors instead of employees in alleged violation of the IWPCA. The entire class consists of drivers who provided services to BeavEx subject to "Owner/Operator" agreements which classified them as independent contractors. This type of formulaic behavior is sufficient for a finding of commonality. *See Keele*, 149 F.3d at 594 (commonality is satisfied where defendant engaged in standardized conduct towards members of the proposed class). There are also two common questions for the class: (1) whether the drivers were employees or independent contractors; and (2) whether BeavEx made improper deductions from the drivers' pay.

### D. The Plaintiffs do not Satisfy the Predominance Requirement of Rule 23(b)(3)

The real issue is whether common questions and evidence predominate a claim for employment misclassification under the IWPCA such that it is properly suited to a class action. Federal Rule of Civil Procedure Rule 23(b)(3) requires the Plaintiffs to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In applying these standards, courts focus on "the substantive elements of plaintiffs' cause of action and inquire into

**RSA.018**

the proof necessary for the various elements." *Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981).

The Supreme Court has held that "the predominance criterion is far more demanding" than "Rule

23(a)'s commonality requirement." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

At its hub, the Plaintiffs' claim focuses on the alleged misclassification of drivers by BeavEx in

violation of the IWPCA. The determinant issue for class certification thus becomes whether

IWPCA independent contractor analysis can be satisfied by evidence common to the class.

The independent contractor exception to the IWPCA's requirements provides that an

individual is not an employee if that individual is someone:

> (1) who has been and will continue to be free from control and direction over the
> performance of his work, both under his contract of service with his employer and
> in fact; and (2) who performs work which is either outside the usual course of
> business or is performed outside all of the places of business of the employer
> unless the employer is in the business of contracting with third parties for the
> placement of employees; and (3) who is in an independently established trade,
> occupation, profession or business.

820 ILCS 115/2. The test is conjunctive, meaning the putative employer must demonstrate each

element of the exemption in order to demonstrate that the service provider is an independent

contractor. *See Novakovic v. Samutin*, 354 Ill. App.3d 660, 668 (1st Dist. 2004). Because the

onus is on the putative employer, the IWPCA creates a near-presumption that a worker is an

employee rather than an independent contractor. *See Adams v. Catrambone*, 359 F.3d 858, 864

(7th Cir. 2004).

The Plaintiffs have argued that the second and third prongs of the test may be resolved

through common evidence. BeavEx acknowledges that the second prong of the test does not

require individualized proof but, on the other hand, maintains that it must be allowed to present

individualized evidence regarding the first and third prongs of the independent contractor test. It

contends that because the IWPCA specifically requires the fact-finder to go beyond the

owner/operator agreements in this case and consider the actual relationship between the parties "in fact," IWPCA independent contractor analysis is inherently incompatible with a class action. Moreover, BeavEx claims that certifying the class based only on common evidence pertinent to the second prong of the test would be equivalent to a decision on the merits. The Plaintiffs state that to the extent that glossing over the first prong would constitute a decision on the merits, the modern trend is for courts to consider the merits when granting class certification. *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (a judge may make a preliminary inquiry into the merits under Rule 23).

There is really no dispute that the second prong of the independent contractor test can be satisfied by common evidence. BeavEx has admitted that its sole business is the delivery and pick-up of packages and that the Plaintiffs and putative class members worked as delivery drivers. The problem presents itself when looking at the first and third prongs, specifically, the first prong's requirement of freedom from "control and direction…**in fact**." *See* 820 ILCS 115/2 (emphasis added). Neither the Supreme Court nor any of the Circuits have provided guidance in this department, and the district courts are split on the issue. *Compare In re FedEx Ground Package Sys., Inc. Employment Practices Litig.*, 273 F.R.D. 424, 489 (N.D. In. 2008) ("*In re FedEx I*") (the IWPCA poses questions upon which FedEx must be allowed to present driver-by-driver evidence); *In re FedEx Ground Package Sys., Inc. Employment Practices Litig.*, 273 F.R.D. 516, 523 (N.D. In. 2010) ("*In re FedEx II*") ("Even though the second prong of the [IWPCA] test can be decided on common evidence, a determination that FedEx can't rebut this prong of the test, obviating the need to determine the other two elements, would be a decision on the merits, which is improper at the class certification stage."); *Schwann v. FedEx Ground Package Sys., Inc.*, No. 11-11094-RGS, 2013 WL 1292432, at *3 (D. Ma. Apr. 4, 2013) (the first

20

and third prongs of a nearly identical Massachusetts independent contractor statute require individualized factual inquiries); *with De Giovanni v. Jani-King Intern., Inc.*, 262 F.R.D. 71, 85 (D. Ma. 2009) (finding that employment classification dispute under Massachusetts independent contractor statute could be resolved by common evidence); *Martins v. 3PD, Inc.*, No. 11-11313-DPW, 2013 WL 1320454 at *6 (D. Ma. Mar. 28, 2013) (all three prongs of Massachusetts independent contractor statute could be resolved through common evidence).

The Court finds the reasoning in both *In re Fedex* actions to be persuasive and directly on point. The *In re FedEx* court dealt with the same independent contractor test at issue here and this Court agrees with its conclusion. In the multi-district litigation *In re FedEx*, a group of Illinois plaintiffs asserted a claim for a violation of the IWPCA, among other things. *In re FedEx II*, 273 F.R.D. at 520. Specifically, the plaintiffs challenged FedEx's practice of labeling its delivery drivers as independent contractors instead of employees. *In re FedEx I*, 273 F.R.D. at 434. The plaintiffs contended that because FedEx maintained a categorical policy of classifying its drivers as independent contractors, a class action was appropriate because common evidence could resolve all claims. *Id.*

The court disagreed, finding that the IWPCA "seems to contemplate that even when the 'employment' agreement vests enough control in the hiring party to create an employment relationship, the inquiry still must extend into the parties' extracontractual relationship." *Id.* at 489. Because the IWPCA broadens the scope of relevant evidence by placing the burden on the hiring party, that party must be able to present individualized evidence of each worker. *Id.* In conclusion, the court held that the effect of the contracts entered into did not predominate over the individual circumstances. *Id.* at 490.

RSA.021

The Plaintiffs here are requesting the same thing that was refused in *In re FedEx*. First, although the Plaintiffs are correct in stating that an inquiry into the merits may be made at the class certification stage, merits questions may be considered only to the extent that they are necessary. *See Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013); *see also Messner*, 669 F.3d at 811 (a district court should not turn class certification proceedings into a dress rehearsal for a trial on the merits). Yet this is precisely what the Court would be doing were it to ignore the first prong of the independent contractor test's requirement of freedom from control "in fact." It is irrelevant that common evidence will show that BeavEx is unable to satisfy the second prong of the test. *See In re FedEx II*, 273 F.R.D. at 523 ("a determination that FedEx can't rebut this prong of the test, obviating the need to determine the other two elements, would be a decision on the merits, which is improper at the class certification stage"). At the class certification stage, the Court must look at the IWPCA test in its entirety to determine if common evidence will predominate the resolution of its analysis. It is not enough that the second prong can be decided utilizing common evidence when the first prong so clearly requires a factual inquiry into the circumstances of each driver. *See Carpetland U.S.A., Inc. v. Illinois Dep't of Employment Security*, 201 Ill.2d 351, 374-383 (2002) (listing 25 factors to examine whether direction or control exists beyond the contract under the same test used for the Unemployment Insurance Act). Because a finding of independent contractor status requires the Court to examine each prong of the IWPCA test, including a requirement to probe beyond the Operating Agreements in this case and into the actual practicing relationship between the parties, BeavEx must be given the opportunity to rebut the control factor by presenting individualized evidence pertaining to each driver, even if it will ultimately fail under the second prong.

RSA.022

Moreover, the disparity in the testimony found in the parties' respective declarations of numerous past and present drivers supports BeavEx's contention that differing factual backgrounds will be found throughout the class. In their depositions, the Plaintiffs stated that BeavEx does not permit drivers to take breaks, run personal errands, or even stop to use a bathroom during routes. On the contrary, declarations filed by other drivers include statements evidencing that personal breaks and errands could be completed during a route as long as the delivery was completed within the timeframe agreed to. Also regarding control "in fact," the Plaintiffs stated that they did not engage in any other work during the time they provided delivery services for BeavEx. Other drivers stated that they currently perform courier services for other companies in addition to BeavEx. There are similar disparities regarding the ability to negotiate price terms for routes, required cell phone usage, and ability to turn down on-demand work. These variations in details concerning the control BeavEx maintained over the putative class members supports the notion that individual facts and evidence are abound in an analysis under the IWPCA independent contractor test.

At the class certification stage, the Court must examine the IWPCA test in its entirety. Failure to acknowledge the individualized inquiry required by the first prong because the second prong can be decided through common facts would be the same as ruling on the merits. Since there is no way to employ generalized proof to prove control "in fact," or lack thereof, under the first prong of the IWPCA test, the Plaintiffs have failed to meet their burden under Rule 23(b)(3) because common facts do not predominate. Accordingly, the motion for class certification is denied.

### III. The Plaintiffs' Motion for Summary Judgment

Although the motion for class certification is denied, the summary judgment motion as to the named Plaintiffs is ripe and they are entitled to a ruling on their claim without additional delay. Finding no disputed issue of material fact that the Plaintiffs were working within the usual course and place of business of BeavEx when making deliveries, the Court grants the named Plaintiffs' partial motion for summary judgment on their IWPCA claim.

### A. Employment Misclassification

The Court integrates the common undisputed facts from above and in so doing, views the facts in the light most favorable to BeavEx. *See McCann v. Iroquois Memorial Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (in determining whether an issue of material fact exists, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in that party's favor). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The IWPCA defines an "employee" as "any individual permitted to work by an employer in an occupation," but excludes any individual:

> (1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and (2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and (3) who is in an independently established trade, occupation, profession or business.

820 ILCS §115/2. The alleged employer must demonstrate the exemption's applicability and each element of the exemption must be present for the service provider to be an independent

**RSA.024**

contractor. *See Adams*, 359 F.3d at 864 (IWPCA independent contractor test is written in the conjunctive); *see also Novakovic*, 354 Ill. App.3d at 668 (same).

In this case, the Court need only address the second prong of the test: whether the Plaintiffs' performed work outside the usual course of BeavEx's business or outside of BeavEx's places of business. BeavEx can satisfy this prong through evidence of either condition. *See id.* at 669. Regarding the first condition, "when considering the employer's usual course of business, Illinois courts focus on whether the individual performs services that are necessary to the business of the employer or merely incidental." *Carpetland*, 201 Ill.2d at 386. The second condition is not limited only to its own home offices, but can extend to any location where workers regularly represent an employer's interest. *Id.* at 389-91.

The Plaintiffs have argued that it is undisputed that they were operating within the usual course of BeavEx's business because BeavEx is a delivery service and the Plaintiffs were working as delivery drivers. Further, the Plaintiffs contend that they performed work within BeavEx's places of business, maintaining that the delivery routes were BeavEx's places of business. BeavEx's only argument is that ruling on the Plaintiffs' motion for summary judgment before deciding on class certification violates the rule against one-way intervention.

The rule against one-way intervention "bars potential class members from waiting on the sidelines to see how the lawsuit turns out and, if a judgment for the class is entered, intervening to take advantage of the judgment." *Amati v. City of Woodstock*, 176 F.3d 952, 957 (7th Cir. 1999). The apprehension is that a "victory by the plaintiff [on the merits] would be followed by an opportunity for other members of the class to intervene and claim the spoils; a loss by the plaintiff would not bind the other members of the class." *Premier Elec. Const. Co. v. National Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 362 (7th Cir. 1987). Clearly, BeavEx's concerns are

25

assuaged here as the Court has denied the Plaintiffs' motion for class certification in this very opinion. *See Amati*, 176 F.3d at 957. ("The rule does not appear to be addressed to the case in which class certification is denied").

Additionally, there is no problem with the Court determining both of Plaintiffs' motions at the same time. Although normally, the issue of class certification should be resolved before determination of an action on the merits, *see Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013), cases exist where it is appropriate to defer class certification until after a decision on the merits. *See Chavez v. Illinois State Police*, 251 F.3d 612, 629 (7th Cir. 2001). In this case, the Plaintiffs filed both their motions for class certification and partial summary judgment at the same time. In the interest of judicial efficiency, the Court has simply examined both concurrently, and this is not a unique stance. *See generally, Smith v. Short Term Loans*, No. 99 C 1288, 2001 WL 127303 (N.D. Ill. Feb. 14, 2001) (court looked at nine different motions at the same time, including cross-motions for summary judgment and a motion to certify class); *Allen v. Aronson Furniture Co.*, 971 F. Supp. 1259 (N.D. Ill. 1997) (court ruled on cross-motions for summary judgment before class certification); *Hakim v. Accenture U.S. Pension Plan*, 735 F. Supp.2d 939 (N.D. Ill. 2010) (cross-motions for summary judgment made class certification motion moot).

BeavEx only contended that ruling on the Plaintiffs' motion for summary judgment before ruling on the motion for class certification would be improper. This issue is now resolved. BeavEx chose not to respond to the merits of the Plaintiffs' motion for summary judgment in any way, therefore waiving any argument against the merits it may have had. *See Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865, 876 (7th Cir. 2008) (arguments not made in responsive briefs to summary judgment are waived); *Laborers' Intern. Union of North America v. Caruso*, 197 F.3d

**RSA.026**

1195, 1197 (7th Cir. 1999) (arguments not presented to the district court in response to summary judgment motions are waived); *see, e.g., De v. City of Chicago*, 912 F. Supp.2d 709, 733 (N.D. Ill. 2012) (if party opposing summary judgment fails to present reasons why summary judgment should not be entered, the claim is waived and the nonmoving party will lose the motion) (citing *Reklau v. Merch. Nat'l Corp.*, 808 F.2d 628, 630 n. 4 (7th Cir. 1986)). Nevertheless, the Court will provide a brief synopsis of the appropriateness of summary judgment in this case. *See King v. Schieferdecker*, 498 Fed. Appx. 576, 580 (7th Cir. 2012) (courts can consider materials not cited by either party in a ruling on summary judgment).

Any potential argument BeavEx could have made would fail even if properly stated. BeavEx is a same-day delivery service company, and its primary function is to provide motor vehicle transportation of property for compensation. The Plaintiffs were courier drivers who performed delivery services for BeavEx. It is undisputed and beyond doubt that BeavEx's delivery drivers performed work in the usual course of BeavEx's package and delivery business. *See AFM Messenger Service, Inc. v. Department of Employment Sec.*, 198 Ill.2d 380, 406 (2001) (courier companies' usual course of business is delivery of packages); *Chicago Messenger Service v. Jordan*, 356 Ill. App.3d 101, 107 (1st Dist. 2005) (undisputed that couriers performed services that were integral to and within the usual course of courier company's business).

Moreover, the Plaintiffs were providing this work within BeavEx's places of business. BeavEx does not dispute that the Plaintiffs reported to BeavEx office locations to pick up route manifests and materials. Even if the time spent at these office locations was minor, a courier company's "place of business" is not limited to its own offices. *See AFM*, 315 Ill. App.3d at 315 (the roadways were the usual place of business for a package delivery company); *Jordan*, 356 Ill. App.3d at 115 (couriers represent the company's interests when making deliveries); *see, e.g., In*

**RSA.027**

*re FedEx Ground Package System, Inc. Employment Practices Litig.*, No. MDL-1700, 2010 WL
2243246 (N.D. In. May 28, 2010) (roadways, delivery routes, sales territories, and customer
premises constitute a company's place of business when the worker is representing the
company's interest).

BeavEx provides package pick-up and delivery services through a network of drivers.
BeavEx required the Plaintiffs to provide these services for BeavEx which were necessary to its
business of courier services. The Plaintiffs had to wear apparel with the BeavEx logo and a
BeavEx identification badge when performing deliveries. Although the Plaintiffs' supplied their
own vehicles, they were required to have the BeavEx name, logo, phone number, and Illinois
Commerce Commission number on both sides. The Plaintiffs were required to use scanners and
record logs when delivering packages, and BeavEx would occasionally perform audits on the
Plaintiffs to ensure they were complying with the rules and policies. Even if the audits were not
applied uniformly, BeavEx's policies underlying the audits show that BeavEx attempts to
maintain its image and reputation by reviewing its drivers' performance while on route.

Even when the Court considers all the facts in BeavEx's favor, BeavEx cannot satisfy its
burden of showing that the Plaintiffs' work was outside all the places of its business. The
undisputed evidence shows that BeavEx drivers represent BeavEx's interest when delivering and
picking up packages. As such, BeavEx is unable to show that the Plaintiffs were independent
contractors under the IWPCA test. Because there is no genuine issue of material fact that BeavEx
is unable to demonstrate the second prong of the exemption under the IWPCA, the Court grants
the named Plaintiffs' motion for summary judgment as to Count II of their complaint.

RSA.028

## **CONCLUSION**

For the foregoing reasons, BeavEx's motion for summary judgment and the Plaintiffs' motion for class certification are denied, and the Plaintiffs' motion for partial summary judgment is granted as to the named plaintiffs.

Date: March 31, 2014

RSA.029

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

Costello

Plaintiff(s),

v.

Beavex

Defendant(s).

Case No. 12 c 7843
Judge Virginia M. Kendall

## ORDER

The Plaintiffs' Motion for Reconsideration (Dkt. 98) and the Defendant's Motion for Reconsideration (Dkt. 104) are denied. The Plaintiffs' Motion to Grant Notice of the Denial of Class Certification (Dkt. 96) is dismissed without prejudice.

## STATEMENT

Plaintiffs Thomas Costello, Megan Baase Kephart, and Osama Daoud worked as courier drivers for Defendant BeavEx Inc. The Plaintiffs filed a Complaint individually and on behalf of all others similarly situated against BeavEx, alleging that they and the putative class members were misclassified as independent contractors when they were actually employees. The parties cross-moved for summary judgment and the Plaintiffs concurrently moved for class certification. The Court denied BeavEx's motion for summary judgment and the Plaintiffs' motion for class certification but granted partial summary judgment as to the named Plaintiffs. *See Costello v. BeavEx Inc.*, No. 12 C 7843, 2014 WL 1289612 (N.D. Ill. Mar. 31, 2014). The Plaintiffs now move the Court to (1) reconsider its denial of class certification and (2) grant notice to putative class members that class certification was denied. BeavEx seeks reconsideration on its motion for summary judgment regarding preemption. For the reasons set forth below, both motions for reconsideration are denied and the Plaintiffs' motion to grant notice of the denial of class certification is dismissed without prejudice.

## BACKGROUND

The facts of this case are described in detail in the Court's March 31, 2014 opinion and are incorporated herein by reference. *See Costello*, 2014 WL 1289612, at *1-3. The Court assumes familiarity with those facts. On March 31, 2014, the Court issued a Memorandum Opinion and Order. Pertinent to the instant discussion, the Court (1) denied BeavEx's motion for summary judgment because the Federal Aviation Administration Authorization Act of 1994 ("FAAAA") did not preempt the Illinois Wage Payment and Collection Act ("IWPCA"); (2) denied the Plaintiffs' motion for class certification because common questions of fact did not predominate the Plaintiffs' claim for employment misclassification under the IWPCA; and (3) granted the

named Plaintiffs' motion for summary judgment because they performed work in the usual course of BeavEx's business, thereby establishing themselves as employees of BeavEx.

## LEGAL STANDARD

As a threshold matter, the Plaintiffs move for reconsideration under Fed. R. Civ. P. 59(e). But Rule 59(e) applies only to motions seeking relief from final judgments or orders. *See, e.g., Duffin v. Exelon Corp.*, No. 06 C 1382, 2007 WL 1385369, at *2 (N.D. Ill. May 4, 2007). Rule 54(b) of the Federal Rules of Civil Procedure is more properly invoked; it provides that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities." Courts in this District have construed motions to reconsider interlocutory orders as arising under Rule 54(b) in addition to the Court's inherent authority to do so. *See F.D.I.C. v. Mahajan*, No. 11 C 7590, 2013 WL 3771419, at *1 (N.D. Ill. July 16, 2013) (Kendall, J.).

Motions for reconsideration are extraordinary in nature and are viewed with disfavor. *See, e.g., Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); *see also In re Abbott Depakote S'holder Derivative Litig.*, No. 11 C 8114, 2013 WL 4953686, at *1 (N.D. Ill. Sept. 12, 2013) (Kendall, J). A motion for reconsideration is not an appropriate vehicle for relitigating previously rejected arguments or introducing evidence or legal theories that could have been presented earlier. *See Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 511-12 (7th Cir. 2007); *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). Instead, motions for reconsideration may only be brought "to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale*, 90 F.3d at 1269. As a result, they are only appropriate where: (1) the court has misunderstood a party; (2) the court has made a decision outside the adversarial issues presented; (3) the court has made an error of apprehension; (4) a significant change in the law has occurred; or (5) significant new facts have been discovered. *Bank of Waunakee*, 906 F.2d at 1191. Given their limited purpose, courts rarely grant motions to reconsider. *Id.*

## DISCUSSION

### A. The Plaintiffs' Motion for Reconsideration

The Plaintiffs' original motion for class certification and motion for reconsideration contend that common questions of fact predominate over any questions affecting only individual members. The Plaintiffs maintain that the Court's decision to the contrary was error, primarily arguing that the Court refused to make a preliminary inquiry into the merits when deciding whether to certify the class. In essence, the Plaintiffs believe that the Court found it was prohibited from taking a "peek" or "glimpse" into the merits when considering class certification. The Plaintiffs' belief is incorrect.

The Plaintiffs' argument misconstrues the Court's March 31st Order. The Court readily agreed that "the Plaintiffs are correct in stating that an inquiry into the merits may be made at the class certification stage" and that "merits questions may be considered only to the extent that they are necessary." *Costello*, 2014 WL 1289612 at *10 (citing *Amgen, Inc. v. Conn. Ret. Plans and Trust*

*Funds*, 133 S. Ct 1184, 1194-95 (2013)). The Court did not hold that it could not look at the merits at the class certification stage; instead, it deemed such an inquiry unnecessary.

Pursuant to the IWPCA, an individual providing services for another is presumed to be an employee unless the putative employer can demonstrate: (1) the individual is "free from control and direction over the performance of his work, both under his contract of service with his employer, and in fact;" and (2) the individual performs work either outside the usual course of business of outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and (3) the employee is in an independently established trade, occupation, profession, or business. 820 ILCS 115/2; *Novakovic v. Samutin*, 354 Ill. App.3d 660, 667-68 (1st Dist. 2004). This "independent contractor test" is conjunctive, meaning the putative employer must demonstrate each element of the exemption in order to demonstrate that the service provider is an independent contractor. *Id.* at 668. Here, there was "really no dispute that the second prong of the independent contractor test can be satisfied by common evidence." *Costello*, 2014 WL 1289612 at *20. In fact, BeavEx recognized as much. *See id.* at *19 ("BeavEx acknowledges that the second prong of the test does not require individualized proof"). With that, the Court's inquiry into the second prong was complete and a merits review was entirely unnecessary. This case does not present disputed legal or factual premises requiring an examination of the merits at the class certification stage. Making a determination that common questions of fact would dictate whether the performance of courier drivers is in the usual course of business of a courier company required no merits inquiry; the answer was not only in the affirmative, but also undisputed by the parties. This quickly-reached conclusion made any survey of the merits gratuitous:

> Although we have cautioned that a court's class-certification analysis must be "rigorous" and may "entail some overlap with the merits of the plaintiff's underlying claim," *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011), Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.

*Amgen*, 133 S. Ct. at 1194-95 (internal citations and quotation marks omitted). Both parties and the Court agreed that the second prong of the test did not require individualized evidence. Accordingly, an inquiry into the merits of the second prong was not warranted.

If this were the end of the class certification analysis, this Court would agree with the conclusion reached in *Brandon, et al. v. 3PD, Inc.*, No. 13 C 3745, Dkt. No. 76 at 30 (certifying a class only on the single issue of the second prong of the independent contractor exemption "because the single issue of prong two can determine the putative class's claim and can be determined by common evidence about [the Defendant's] business practices"). But at the class certification stage, the Court must look at the IWPCA test in its entirety to determine if common evidence will predominate the resolution of its analysis. Because the first prong necessitates a factual inquiry into the circumstances of each driver, the denial of class certification was appropriate. Even though the Plaintiffs' conclusion regarding the second prong ultimately proved correct at summary judgment, making that same determination at class certification would have been premature. *See Amgen*, 133 S. Ct. at 1195 (quoting Fed. R. Civ. P. 23 Advisory Committee's 2003 note ("[A]n evaluation of the probable outcome on the merits is not properly part of the

certification decision.") (internal quotation marks omitted)). The Plaintiffs' motion to reconsider is therefore denied.

The Plaintiffs' remaining arguments that (1) the Court should readdress the class certification motion now that it found for the named Plaintiffs at the summary judgment stage and (2) that the Plaintiffs' concession that individual questions predominate the first prong of the independent contractor test's requirement for freedom from control "in fact" means the Court can now solely examine the universal contract signed by all BeavEx drivers are similarly unavailing. First, the fact that the common evidence utilized under the second prong of the independent contractor test leads to the conclusion that BeavEx is unable to demonstrate that its drivers were properly classified as independent contractors is not dispositive of the appropriateness of class certification in this case. At the class certification stage, the Plaintiffs' cause of action, as a whole, must satisfy the predominance requirement of Rule 23(b)(3). The IWPCA's requirement of freedom from control "in fact" makes a class action inherently unsustainable. Second, the Plaintiffs' assertion that by conceding the fact that they cannot show that they were free from control in fact, thereby mooting the issue and leaving only a determination of whether they were free under their contracts, is an attempt "to advance arguments or theories that could and should have been made before" this Court issued its judgment. *See Sigsworth*, 487 F.3d at 512. A motion to reconsider is not properly utilized for this purpose. Although BeavEx has the ultimate burden of showing that the Plaintiffs are independent contractors, the Plaintiffs have the burden on their motion for class certification of showing that the issue can be determined by common proof. This they did not do.

## B. BeavEx's Motion for Reconsideration

BeavEx's motion for reconsideration contends that (1) a significant change in the law occurred subsequent to the Court's finding that the IWPCA was not preempted by the FAAAA and (2) the Court erred by misapplying the standard of proof required for BeavEx to demonstrate preemption. Specifically, BeavEx contends that the Supreme Court's decision in *Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422 (2014) makes clear that the IWPCA is preempted by the FAAAA. BeavEx additionally argues that the Court improperly required BeavEx to show that the IWPCA will have a significant economic impact upon it. Neither of BeavEx's arguments warrant reconsideration. Because *Ginsberg* did not alter the requirement that a challenged law be related to rates, routes, or services in order to be preempted, BeavEx's motion is denied.

### 1. *Ginsberg* Did Not Eliminate the Requirement that a State Law be "Related to" Routes or Services

BeavEx maintains that *Ginsberg* established a new, bright-line rule for when a state law claim is preempted by the Airline Deregulation Act ("ADA") (and correspondingly, the FAAAA): where the claim seeks to enforce the existing rights voluntarily undertaken by the parties, it is not preempted; but when the claim is based on a state-imposed obligation, then it is preempted. In *Ginsberg*, the Supreme Court held that an airline customer's claim against the airline for breach of an implied covenant, stemming from the termination of his membership in the airline's frequent flyer program, was "related to" the airline's prices, routes, and services. *Ginsberg*, 134 S. Ct. at 1431. The Supreme Court concluded that, because frequent flyer mileage credits could be redeemed for tickets, upgrades, and services, the breach claim met the "related" to test, *id.*,

and, because the breach claim sought to enlarge the contractual relationship that the airline and the customer had voluntarily undertaken, was preempted under the ADA. *Id.* at 1433

But BeavEx's argument falls because it fails to recognize that *Ginsberg* did not disrupt the requirement for FAAAA preemption that the state law be "relate[d] to rates, routes, or services." *Id.* at 1430. The *Ginsberg* Court only reached the "central issue" of whether the claim before it was based on a state-imposed obligation or was simply one that the parties voluntarily undertook by first finding that the claim "related to" Northwest's rates, routes, and services. *Id.* at 1431. Here, the analysis never gets that far because the IWPCA is not "related to" motor carriers' rates, routes, or services. Generally applicable background laws that are several steps removed from prices, routes, or services are not preempted, even if employers must consider those regulations when deciding the prices they set, the routes they use, or the services they provide. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 375 (FAAAA does not generally preempt state regulation that broadly prohibits certain forms of conduct and affects motor carriers only in their capacity as members of the public); *S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 558 (7th Cir. 2012) (changes to background laws, including labor laws and minimum wage laws, "ultimately affect the costs of [labor] inputs, and thus, in turn, the 'price … or service' of the outputs. Yet no one thinks that the ADA or the FAAAA preempts these and the many comparable state laws … because their effect on price is too 'remote.') (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 390 (1992). "A state law does not meet the 'related to' test for FAAAA preemption just because it shifts incentives and makes it more costly for motor carriers to choose some routes or services *relative* to others, leading the carriers to reallocate resources or make different business decisions." *Dilts v. Penske Logistics, LLC*, No. 12-55705, 2014 WL 4401243, at *7 (9th Cir. Sept. 8, 2014).

The IWPCA's effect on prices is too remote to be "related to" motor carriers' prices, routes, and services because it affects motor carriers "one or more steps away from the moment at which the firm offers its customer a service for a particular price." *S.C. Johnson*, 697 F.3d at 558. Even though imposition of the IWPCA may increase BeavEx's operating costs, it affects BeavEx only as a member of the public. Any impact on BeavEx's rates, routes, or services is therefore peripheral to the actual focus of the law: to regulate the employer-employee relationship in Illinois generally. The IWPCA therefore is a broad law with no "forbidden connection with prices[, routes,] and services." *See Air Transp. Ass'n of Am. v. City & Cnty. of S.F.*, 266 F.3d 1064, 1072 (9th Cir. 2001). Nor does it "freeze into place" prices, routes, or services that motor carriers provide. *Rowe*, 552 U.S. at 372. The IWPCA is accordingly not preempted by the FAAAA and BeavEx's motion for reconsideration is denied.

## 2. The Court Did Not Err When it Required BeavEx to Demonstrate a Significant Economic Impact

BeavEx argues that the Court, after concluding that the IWPCA was a "background law" outside the ambit of FAAAA preemption, improperly held it to a heightened standard requiring BeavEx to demonstrate that the IWPCA would have a significant economic effect upon its rates, routes, or services. BeavEx's argument summarily ignores the Seventh Circuit's direction that " a claim is preempted if *either* the state rule expressly refers to air carriers' rates, routes, or services, or application of the state's rule would have 'a significant economic effect upon them.' " *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 609 (7th Cir. 2000) (quoting *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996)).

Case: 1:12-cv-07843 Document #: 139 Filed: 10/29/14 Page 6 of 6 PageID #:1879

Nevertheless, BeavEx's lack of evidence demonstrating a significant economic impact of the IWPCA was merely additional support for the Court's ultimate conclusion that the IWPCA is not preempted by the FAAAA. The crux of this Court's Opinion was that because the IWPCA simply standardizes the employment arena within Illinois and operates at least a step away from the point where BeavEx offers services to its customers, it does not meet the "related to" test necessary for FAAAA preemption. This remains true today. BeavEx's motion for reconsideration is denied.

**C. The Plaintiffs' Motion to Grant Notice of the Denial of Class Certification**

The Plaintiffs' stated that if they were unsuccessful in moving this Court to reconsider its denial of class certification, "they will be seeking an interlocutory appeal" of the ruling. Dkt. No. 96 at 2 n.1. Accordingly, a ruling ordering notice now would be premature. In the interests of judicial economy, this Court dismisses the Plaintiffs' motion to grant notice of the denial of class certification without prejudice. The Plaintiffs are free to re-file the motion after the Seventh Circuit rules on the interlocutory appeal. *See, e.g., Puffer v. Allstate Ins. Co.*, 614 F. Supp.2d 905, 918 n.8 (N.D. Ill. 2009) (while finding that notice of denial of class certification was warranted, court declined to order notice be given until after the Seventh Circuit ruled on a pending petition for permission to take an interlocutory appeal of the court's denial of class certification).

Date:  October 29, 2014

Virginia M. Kendall
United States District Judge

| United States Code Annotated |
| --- |
| **Title 49.** Transportation (Refs & Annos) |
| **Subtitle IV.** Interstate Transportation (Refs & Annos) |
| **Part B.** Motor Carriers, Water Carriers, Brokers, and Freight Forwarders (Refs & Annos) |
| **Chapter 145.** Federal-State Relations |

49 U.S.C.A. § 14501

§ 14501. Federal authority over intrastate transportation

Effective: August 10, 2005

Currentness

**(c) Motor carriers of property.--**

**(1) General rule.**--Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

**(2) Matters not covered.**--Paragraph (1)--

**(A)** shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization;

**(B)** does not apply to the intrastate transportation of household goods; and

**(C)** does not apply to the authority of a State or a political subdivision of a State to enact or enforce a law, regulation, or other provision relating to the price of for-hire motor vehicle transportation by a tow truck, if such transportation is performed without the prior consent or authorization of the owner or operator of the motor vehicle.

**(3) State standard transportation practices.--**

**(A) Continuation.**--Paragraph (1) shall not affect any authority of a State, political subdivision of a State, or political authority of 2 or more States to enact or enforce a law, regulation, or other provision, with respect to the intrastate transportation of property by motor carriers, related to--

**(i)** uniform cargo liability rules,

**(ii)** uniform bills of lading or receipts for property being transported,

**RSA.036**

**(iii)** uniform cargo credit rules,

**(iv)** antitrust immunity for joint line rates or routes, classifications, mileage guides, and pooling, or

**(v)** antitrust immunity for agent-van line operations (as set forth in section 13907), if such law, regulation, or provision meets the requirements of subparagraph (B).

**(B)  Requirements.**--A law, regulation, or provision of a State, political subdivision, or political authority meets the requirements of this subparagraph if--

**(i)** the law, regulation, or provision covers the same subject matter as, and compliance with such law, regulation, or provision is no more burdensome than compliance with, a provision of this part or a regulation issued by the Secretary or the Board under this part; and

**(ii)** the law, regulation, or provision only applies to a carrier upon request of such carrier.

**(C)  Election.**--Notwithstanding any other provision of law, a carrier affiliated with a direct air carrier through common controlling ownership may elect to be subject to a law, regulation, or provision of a State, political subdivision, or political authority under this paragraph.

**(4) Nonapplicability to Hawaii.**--This subsection shall not apply with respect to the State of Hawaii.

**(5) Limitation on statutory construction.**--Nothing in this section shall be construed to prevent a State from requiring that, in the case of a motor vehicle to be towed from private property without the consent of the owner or operator of the vehicle, the person towing the vehicle have prior written authorization from the property owner or lessee (or an employee or agent thereof) or that such owner or lessee (or an employee or agent thereof) be present at the time the vehicle is towed from the property, or both.

**RSA.037**

🚩 KeyCite Red Flag - Severe Negative Treatment

Enacted Legislation    **Amended by**    2014 Ill. Legis. Serv. P.A. 98-862 (H.B. 5622) (WEST),

🚩 KeyCite Yellow Flag - Negative Treatment    Proposed Legislation

West's Smith-Hurd Illinois Compiled Statutes Annotated
  Chapter 820. Employment
    Wages and Hours
      Act 115. Wage Payment and Collection Act (Refs & Annos)

820 ILCS 115/2
Formerly cited as IL ST CH 48 ¶39m-2

115/2. Definitions

Effective: July 14, 2006
Currentness

§ 2. For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. Payments to separated employees shall be termed "final compensation" and shall be defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties. Where an employer is legally committed through a collective bargaining agreement or otherwise to make contributions to an employee benefit, trust or fund on the basis of a certain amount per hour, day, week or other period of time, the amount due from the employer to such employee benefit, trust, or fund shall be defined as "wage supplements", subject to the wage collection provisions of this Act.

As used in this Act, the term "employer" shall include any individual, partnership, association, corporation, limited liability company, business trust, employment and labor placement agencies where wage payments are made directly or indirectly by the agency or business for work undertaken by employees under hire to a third party pursuant to a contract between the business or agency with the third party, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons is gainfully employed.

As used in this Act, the term "employee" shall include any individual permitted to work by an employer in an occupation, but shall not include any individual:

(1) who has been and will continue to be free from control and direction over the performance of his work, both under his contract of service with his employer and in fact; and

(2) who performs work which is either outside the usual course of business or is performed outside all of the places of business of the employer unless the employer is in the business of contracting with third parties for the placement of employees; and

(3) who is in an independently established trade, occupation, profession or business.

**Credits**

P.A. 78-914, § 2, eff. July 1, 1974. Amended by P.A. 83-198, § 1, eff. Jan. 1, 1984; P.A. 89-364, § 43, eff. Aug. 18, 1995; P.A. 89-626, Art. 3, § 3-45, eff. Aug. 9, 1996; P.A. 94-1025, § 10, eff. July 14, 2006.

**Formerly** Ill.Rev.Stat.1991, ch. 48, ¶ 39m-2.

Notes of Decisions (71)

820 I.L.C.S. 115/2, IL ST CH 820 § 115/2
Current through P.A. 98-803, with the exception of P.A. 98-756, of the 2014 Reg. Sess.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.